CAPE COD FOOD PRODUCTS, Inc.

v.

NATIONAL CRANBERRY ASS'N et al.

United States District Court
D. Massachusetts.

Feb. 11, 1954.

James D. St. Clair of Hale & Dorr, Boston, Mass., for plaintiff.

Charles B. Rugg and Henry Streeter, Ropes, Gray, Best, Coolidge & Rugg, Boston, Mass., for defendant.

WYZANSKI, District Judge.

### Charge to the Jury

The Court. Mr. Foreman and members of the jury, this is an action under Section 7 of the Sherman Act, as amended by Section 4 of the Clayton Act, incorporated in Title 15 of the United States Code Annotated § 15.

It is a private, as distinguished from a governmental, action. And it is brought by Cape Cod Food Products Company against individuals and corporations. The individuals are Mr. Chase and Mr. Makepeace and Mr. Urann, and the companies are the National Cranberry Association, United Cape Cod Cranberry Company, Hyannis Trust Company, and A. D. Makepeace Company.

In general, and subject to qualifications which I shall state later, the three essential aspects of the case which you may have to consider—and you may not have to consider all of them—but the most you would have to consider are, first, whether there was a violation of the anti-trust acts, second, whether if such a violation occurred it was a substantial cause of damage to the plaintiff company, and, third, if so, what was the amount of the damage.

You have listened to six days of testimony and one day of argument. And in the hour or so that I take to charge you, I shall of course not be able fully to summarize the evidence which you have heard, nor the arguments that have been addressed to you.

Most of you have sat here before listening to cases. Yet I think that none of you has heard a better presented case than this one. And you as jurors, and I as judge, have every reason to be grateful to counsel for their skill in their preparation of the case, the expedition with which they introduced the evidence, the selectivity that they have followed in emphasizing those points

which were of chief concern, and their generally high professional standards. The skill with which they have performed their job places upon you and me, if possible, an extra obligation to perform our job faithful to our tasks.

Those of you who have sat with me before know that in charging a jury I do not customarily read the charge. There are jurisdictions in which the judge writes out his charge, and there are other jurisdictions in which he reads what counsel gives him, and there are some jurisdictions in which the judge merely states in the loosest and most general terms principles of law and leaves the facts without any analysis whatsoever.

Here, as in simpler cases, what I shall try to do is first to state to you some rather broad principles which govern you and me in the consideration of this case. Then I shall state to you as accurately as I can what seem to me the governing principles of law. And later, I shall analyze some, but not all, of the evidence.

In the trial of this case, and in this charge, I am not endeavoring in any way, directly or indirectly, to indicate my view of the case. I can truthfully say that I have not a personal opinion with respect to how this case should come out. Indeed, this seems to me a case peculiarly suitable for the determination of jurors.

In the arguments which were addressed to you, both counsel said that a great deal turned upon whether you believed certain witnesses. I agree that many of the transactions do turn on what you believe to be the truth of the testimony which you heard. Moreover, underlying this whole case, as I shall explain as I go along, is the question of what was the intent of the three individuals and the four corporations in any action which they did take.

Intent is always a very subtle problem to analyze, and men and women who come from different backgrounds and who come fresh to the law are much more likely to determine these questions of credibility and intent accurately, than is any single man, particularly an individual who from sitting over a long period of time in cases of like character may have formed some unconscious or conscious bias. If I have wanted to express an opinion to jurors in any case, I have not hesitated to do so. Some of you have seen me within the last few weeks express quite clearly how I thought a case should be decided, and I think I know how to do it explicitly when I want to do it. In putting questions to witnesses in this case, in making rulings, in charging the jury, in the tone of my voice, in any gesture or nod, I have not meant indirectly to express any view, and I repeat I have no view as to how this case should be decided.

In this case, as in other cases, you members of the jury are the persons who are to determine what are the facts in the case. It is you who are to judge of the truthfulness of the witnesses. It is your recollection, and not mine nor counsel's that is to govern you in recalling what were the facts shown by the witnesses.

You are expected to take into account all that you heard offered in testimony, whether orally or in writing. There is no particular rule of law in this type of case which gives any special primacy or importance to written, as distinguished from oral, testimony. You may be more persuaded by a written record or you may be more persuaded by oral testimony. But the question is one for you, and there is no rule that one type of testimony is automatically to be preferred to another type.

If testimony is given with respect to conduct which is equivocal, that is to say, which is susceptible of being interpreted as lawful, and in your view equally susceptible as being unlawful, you will interpret it as being lawful. That is to say, if you are persuaded that the conduct is equally consistent with a lawful motive and an unlawful motive, and you don't know which it is, you will interpret it as being lawful.

■ In estimating the truthfulness of witnesses, you will use just those standards which you use in private life. You will take into account the demeanor, the conduct, of a witness on the stand. You will consider whether his story is consistent. You will take into account the testimony that other people give in testing whether that particular witness told the truth. And you will scrutinize the evidence with that care which you devote to the serious matters of life.

So much by way of general instruction. Much that I have said, you have heard me say before. And now I turn more particularly to the problems of law which are presented in this case.

■ You know, and I know, that I may make errors in this statement of law. But if I make an error, it will be corrected by the Court of Appeals or the Supreme Court of the United States, and you as jurors are not to correct me on the law. Your judgment of the facts is final, but my judgment on the law is, for the purposes of this immediate trial, final, subject to reversal on appeal.

You will recall that I said that this was an action brought under Section 7 of the Sherman Act, as subsequently modified by Section 4 of the Clayton Act, and incorporated in the United States Code Annotated. I emphasize that this action is here in this court only on a charge of violation of the anti-trust acts. If the defendants have committed any other wrong—and I don't suggest they committed wrong of any kind, since that is up to you—but if they have committed any other wrong, you and I are not now concerned with it, for the jurisdiction of this court and your right and my right to hear this case are founded exclusively on the anti-trust acts. We are not reviewing the general quality of banking policy, or whatnot, of the defendants. We are concerned with the charge that they have conspired to violate the anti-trust acts.

■ And so I shall, in order to emphasize this, begin by reading to you that aspect of the Federal anti-trust statutes which it is claimed that they have violated. Before I read it, let me in the briefest, and not the most accurate, way characterize its general purport. I think you will follow the words better in detail if I state loosely and generally what is in this section. This section prohibits persons—and by persons, corporations as well as individuals are meant—from conspiring to monopolize, or to attempt to monopolize, interstate commerce. And, as I shall explain in a moment, it is a violation if the conspiracy is directed at any appreciable and recognizable segment of interstate commerce, as, for example, if it were directed to that unit of interstate commerce which includes the processing of cranberries.

So far as it is material, the section of the law to which I have referred, which is Section 2 of the Sherman Act, reads as follows [reading]

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, * * * shall * * * " be deemed to be a violator of the statute.

■ I am going to begin by talking about the word "monopolize" which appears in the statute. And you will note that the word "monopolize" is a verb and not a noun. That is, the statute is directed at one or several people who monopolize; it is not directed in terms at a monopoly, and certainly it isn't directed at what laymen ordinarily talk about as a monopoly. You may start with the notion that anybody who has 100 per cent of the business is a monopoly, but that would be the wrong approach in connection with this statute. As here used, the verb "monopolize" means to acquire through means which are not specifically approved a dominant position in the market so as to exclude actual or potential competition, and to follow such a course of conduct with the intent of monopolizing.

Whether that statement is accurate or not, I am sure you didn't follow it all because it has in it a great many subtleties, and I am going to try to go over some of the subtleties more carefully because, after all, the object of a charge to a jury is not to satisfy an appellate court that you have repeated the right rigmarole of words, but to try to make jurors who are laymen understand what you are talking about.

To monopolize means to take steps toward acquiring a dominant position in the market, and to take such steps when you are not encouraged by the law. There is nothing unlawful under the Sherman Act or any other antitrust act in trying to get even 100 per cent of the market through skill, efficiency, superiority of product, or like entirely laudable steps. It is not unlawful under the anti-trust acts for a Capper-Volstead cooperative, such as the National Cranberry Association admittedly is, to try to acquire even 100 per cent of the market if it does it exclusively through marketing agreements approved under the Capper-Volstead Act, 7 U.S.C.A. §§ 291, 292.

Now, under this Act, it is permissible for a cooperative to purchase through one hand, that is, through the cooperative, and to sell through one hand, and to fix the prices at which it purchased uniformly, and to sell at uniform prices or uniformly changing rates of price.

Other companies not under the Capper-Volstead Act would perhaps violate the anti-trust laws if they combined people to fix the prices at which goods were bought and goods were sold, but a cooperative which is formed under the Capper-Volstead Act is specifically authorized by law to use this unified form of purchasing and unified form of selling.

Hence, it is not a violation of the Sherman Act or any other anti-trust act for a Capper-Volstead cooperative to acquire a large, even a 100 per cent, position in a market if it does it solely through those steps which involve cooperative purchasing and cooperative selling.

On the other hand, it would be a violation of the law, and it would be a prohibited monopolization for a person or group of persons to seek to secure a dominant share of the market through a restraint of trade which was prohibited, or through a predatory practice, or through the bad faith use of otherwise legitimate devices.

You will understand that as I talk to you, I am talking by way of illustration, and not in any sense by way of forming my own personal judgment on the conduct of these defendants or anybody else. But I must give you an illustration, to make more explicit what I have just said.

It would be a prohibited monopolization if a group of persons used their power to lend money and their power to foreclose on loans, not with the intent of forwarding their banking or credit or like interests, but with the purpose of stifling actual or potential competition. That is to say, it would be unlawful for a group of persons to agree to take steps which were directed at excluding actual or potential competition with the intent of accomplishing that particular result, rather than with the intent of doing something innocent to further their general credit, banking, or like policies.

In this case, you will recall that I have read you a statute which said that a person or persons should neither monopolize nor attempt to monopolize. And the complaint which is before you uses both the verb "monopolize" and the longer phrase "attempt to monopolize". In order to violate the statute, in order to permit recovery, it is not necessary that the plaintiff show you that there has actually been achieved a monoplization. It is sufficient if there was an attempt to monopolize.

Probably it would be appropriate for me now to say something about percentage figures, merely to get that question in its proper perspective. You will remember that I have said to you that even a showing in this case that the

defendants held 100 per cent of the market would not by itself show a violation of the statute, because the defendants might have 100 per cent of the market as a result solely of skill, superior products, or following those practices which the Capper-Volstead Act authorizes. And therefore, you are to draw no conclusive presumption from the fact that any particular percentage of the business has been achieved by any one or more of the defendants.

On the other hand, this does not mean that percentage figures are entirely irrelevant. What you are trying to consider is what was the strength of the defendants in a particular market, and how did they achieve that strength? An increasing percentage and a very high percentage of the market may invite much more careful scrutiny than a small percentage. You are at least put on notice to look and ask what was the purpose and what were the means by which a particular percentage was reached.

You will recall that when I read the statute I referred to the phrase "any part of the trade or commerce among the several States". And earlier in my charge, I said that for the purposes of the statute and for the purposes of this complaint in this case, any part of the trade or commerce means any identifiable segment of trade or industry which constitutes, as it were, a kind of separate market, to use a technical economic term.

There can be no doubt, for example, that the national market in processed cranberries is an identifiable market, and can be so considered for the purposes of the statute and the complaint in this case. That is to say, you don't have to mingle in your consideration both raw cranberries and processed cranberries. It is quite sufficient to focus your attention on the processed cranberries. That is a separate market.

It is also possible, if you see fit, to consider as a market both the raw cranberries and the processed cranberries taken together. That is also, in a larger sense, a market. But either market is sufficient.

You will recall that when I talked about the Capper-Volstead Act, I referred to a cooperative which had a right under the law to unite for the purpose of purchasing cranberries and unite for the purpose of selling cranberries. There is nothing in the Capper-Volstead Act which gives a special privilege, exemption, immunity or the like, to the practice of processing cranberries. The statute is limited to buying and selling raw cranberries and other kinds of agricultural and like products.

I now turn to what is another aspect of the law laid down in this statute and relevant to this case, the problem of conspiracy. You will remember that the statute says, not only that any person who shall monopolize or attempt to monopolize, but any person who shall combine or conspire with any other person or persons to monopolize.

In this complaint it is said that the three individual defendants and the four corporations, that is, including the cooperative, conspired. And it is said that there was one, and not several, conspiracies. It has already been explained to you, and quite correctly explained to you, by both counsel in this case, that a conspirary need not be a formal agreement, it need not be embodied in a document; a conspiracy verbally means a breathing together. It can be an implied agreement, it can be a concert of action understood by the parties to be for a common end.

There can be no conspiracy unless more than one person is involved. The very word conspiracy means "together with". But it may be that not all the persons charged with being conspirators are conspirators. It may be that none of them is a conspirator. In order to succeed, the plaintiff does not have to show you that every one of the defendants was in the conspiracy, but it does have to show you that more than one of the defendants was in the conspiracy.

And here I am going to direct your attention to a point which is of some consequence. Ordinarily, an officer of a corporation and his own corporation do not and cannot conspire together. Ordinarily, an officer of a corporation will be acting for the corporation when he acts. And therefore, there is, in contemplation of law, only one action; he is acting for the corporation, and you couldn't say that there is a conspiracy when he acts for the corporation because both he and the corporation are involved.

Although this is the ordinary rule, there are possibilities of exceptional situations. And I am not saying whether this is or is not an exceptional situation in the case before you. It may happen that an individual, let us say X, is the officer of X Company, and is also interested in Y Company, and it may happen that when X acts, he acts both for the X Company and for the Y Company, or he acts both for the X Company and on his own account. If this situation does exist, then it is possible to find a conspiracy, because he is acting in a dual role and he is, in contemplation of law, two persons. I am not trying to tell you whether in this case you will have occasion to apply this doctrine, but I am explaining the doctrine to you.

Now, it was argued to you that there could not be a conspiracy to violate the anti-trust laws in this case unless the National Cranberry Association was found by you to be a conspirator. That is a doctrine that I expressly reject, as to which I save the exception of the party's counsel, and which I shall now try to explain why I reject.

So far as the anti-trust laws are concerned, and so far as this complaint is concerned, what is wrong, if it occurred—and I don't say it occurred—is a monoplizations of a particular segment of the market. And you need not be a member of that market in order to engage in such a conspiracy.

It is conceivable—and I am not suggesting that this is the case—that A, B and C, none of whom is in a particular line of business, conspire to put out of business the X Company for the benefit of the Y Company which is in the business and which, for some reason or other, A, B and C desire to favor. Even though Y is not a member of the conspiracy, if A, B and C have agreed to put out X, they would violate the anti-trust laws, and Y's absence from the conspiracy would not mean that A, B and C went off scot free.

Let me underline the fact that my giving this illustration is merely a disagreement on a technical point of law with an argument that was advanced to you, and is in no sense a rejection of counsel's general position, or endorsement of other counsel's general position. I am merely trying to straighten out one technical matter.

In connection with this whole problem, let me remind you that the complaint charges one conspiracy, and you cannot return any verdict in this case favorable to the plaintiff unless you find that there was one conspiracy. If there were numerous conspiracies unrelated to one another, so that there were two or three or four separate conspiracies, that particular set of facts has not been pleaded and is not before you.

To repeat, in the most general and not now quite such accurate terms, the first issue which is presented to you is, did two or more of the defendants conspire in a single conspiracy to monopolize or to attempt to monopolize an identifiable segment of interstate commerce?

On this, as on every other issue in the case, the plaintiff has the burden of proof. That means that if your minds are evenly in balance you must decide for the defendants, and not for the plaintiff. The plaintiff does not have to persuade you beyond a reasonable doubt, but it does have to persuade you that its is the more probable version.

If you have concluded that there was a conspiracy of the type that I have described, in violation of the anti-trust acts, you will then have to go on to consider the second main issue. On the

other hand, if you have concluded that there was no such conspiracy, that is the end of the case. You may have an intermediate position in which you think some of the defendants were conspirators, and others were not, and in that event you will not proceed to consider further the cases against the individuals whom you have found not to be conspirators, and you will proceed further to consider the cases of those whom you did find to be conspirators.

While I cannot formally control you when you get out in the jury room, I highly recommend that you approach this case in the order in which my charge approaches it, and that you first very thoroughly analyze the question as to whether two or more of the defendants were in a conspiracy of the nature that I have described.

If you have found that two or more of the defendants were in such a conspiracy, you will then have to consider whether their conspiracy was a substantial cause of the damage to the plaintiff. The relationship between wrongdoing and damage is always difficult, and it is particularly difficult in economic cases. We all know that businesses go up and down for many reasons, the weather, a presidential election, stock market conditions, the sun that shines on the cranberries, and the frost that affects their growth. We all know that businesses are affected much more directly sometimes by personal factors, by credit, by the ability of individuals to carry on business, by efficiency, and by a host of factors.

Now, this is always true to one degree or another in every anti-trust case. And the problem which is presented is, where you find a violation of the anti-trust act, if you do find one, was that violation an identifiable substantial cause of damage? There are cases in which it may be the whole cause. There are cases in which it may be no part whatsoever of the result, because in any event the company which complains would have been bankrupt through inefficiency. And there are intermediate cases where one can

say that such-and-such a percentage is due to the violation of the anti-trust act, and such-and-such a percentage is due to the weather or the market or the ability of the parties. If you have found that there is a violation of the anti-trust act, you will have to determine to what extent the consequences which befell the plaintiff were attributable to the wrongdoing of those defendants who, according to my hypothesis—not in any view of my own, but just according to my hypothesis—you have found to be violators of the law.

After you have dealt with the question of causation and the fraction attributable to wrongdoing under the anti-trust acts, you will then have to move to the question of what were the actual damages suffered, provided of course that you have found that there was any violation at all of the law. You may have found there was no violation of the law, and then you would never reach the question of damages.

You will remember that Mr. St. Clair in his argument did discuss the question of damages, because he was confident you would reach that question. You will remember that Mr. Rugg in his argument never discussed the question of damages, because he was confident that you wouldn't reach that point. Needless to say, I don't endorse or reject Mr. St. Clair's view just because I talk about damages. I have to talk about them because they are an issue which was raised in the case by one of the counsel. It does not mean I agree with him or disagree with him.

In all cases of so-called tort, that is, wrongdoing which does not arise out of a contract, the problem of damages is a very uncertain problem. You can't go to a book and look for the answer. The plaintiff must satisfy you that the damage which he suffered was as a fact attributable to the wrongdoing of the defendants. He has the burden of showing that the damage was the certain result of the misconduct of the defendant, or defendants in this case.

But the plaintiff does not have to prove with absolute mathematical accuracy the extent of the damage. You can see how difficult and impossible it would be for a plaintiff who says that he was put out of business to know exactly what damage he suffered. He says, "I suffered two kinds of damages. I lost what I had actually in property, and I lost the chance to make those profits which I could have made if I were left in business. And I don't know exactly how much they would have been. I just know that I am the kind of fellow that would have made money. I was making it", the plaintiff would ordinarily say, "and I would have made it, and you can see that other people made it during that period of time".

■ Our law permits the jury to take into account both the damages which were inflicted on existing property, and damages which were sustained by being unable to make profits which reasonably could be anticipated, and would have been realized had it not been for the wrongdoing of the defendants.

It is a little like some of these tort cases in which some of you may have sat involving personal injury. It sometimes happens, for example, that through the negligence of a defendant a workman is injured, and he says, "I ran up hospital bills and doctors' bills, and not only that, but now I have only one arm and I can't any longer carry on the trade which I used to carry on, which requires two hands. And so what I want as damages is not only my hospital and doctors' bills, but I want the loss that I sustained in earning power during a reasonable period in the future".

■ With respect to damages, you may be somewhat misled by something that you see in the complaint, and just to avoid any misleading I am going to make explicit one point. You are only to calculate damages, if any, or loss of profits, if any, upon the basis of single, and not treble, damages. It is true that under the anti-trust act, if the plaintiff prevails, the judgment which he would ultimately get would be three times the amount of his damages and loss of profits. But the trebling of the amount is no part of the jury's function. That is a question for the court.

■ Likewise, you will see a reference to an attorney's fee, and you are not to take into account any problem with respect to counsel fees. If counsel fees are to be awarded, the Court does it.

■ Finally, I instruct you, subject to the exception of the affected party, that you are not to allow any interest of any kind. The problem of interest is one which has not yet been authoritatively settled by the Supreme Court of the United States. The ruling that I make is in accordance with the ruling of Judge Caffey in the Southern District of New York, and contrary to an earlier ruling of my own.

But I am now bearing in mind a decision in the Supreme Court of the United States * in connection with the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., and double damages, and I have concluded that in a statute where treble damages are available, interest is not appropriately allowed. So you will please not take into account the problems of interest of any kind.

Now, I have in the broadest—some of you may think in the narrowest—way tried to deal with the general questions of law. What I have so far said may be wrong, but you are required to follow what I have said.

I am now going, very briefly, compared with a six day trial, to try to highlight some of these issues against the background of the evidence and arguments. And as I speak now, I am speaking not with the purpose of controlling you; you are entirely free to disregard everything I say from now on. This is merely intended to be my best recollection and my choice of what seems to me significant facts.

I am doing this because the case is complicated, has extended over some pe-

* See Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 715, 65 S.Ct. 895, 89 L.Ed. 1296.

riod of time and falls within an area of experience of which perhaps I have had more than some of you and I know the risk of sending people out in a jury room in an anti-trust case without trying in some way to make them think more concretely about the evidential questions which may be presented to them in the jury room.

And yet let me say not only that I am making a selection which you are not required to observe, and I am not only stating a recollection which may be different from yours and therefore not controlling on you, but I am doing my level best not to indicate a view of my own. I repeat, I haven't any view. I think it would be most inappropriate for me to have a view, and the proportions and the marshaling of this evidence doesn't carry with it any implication that I do have a view.

I may use more words on the plaintiff's version than on the defendants' or more on the defendants' than the plaintiff's but I do not mean indirectly to say I think one side or the other side is right; far from it.

You will remember that of the three red threads to which I have directed your attention, the first, and in most respects the most complicated, was were the defendants or were two or more of them engaged in a single conspiracy to monopolize or to attempt to monopolize an identifiable segment of the interstate market; to wit, presumably the market for processed cranberries.

And I shall, just because it is the more normal way to proceed, talk first about what the plaintiff asserts and then what the defendants assert, but this doesn't mean I think the plaintiff is right and the defendant is wrong. It doesn't mean anything at all except that one has to put one party first, and the plaintiff put on its evidence first.

Now the plaintiff, you will recall, pointed out that in the year 1946 there was, in connection with the current demand, an overproduction of cranberry sauce and, indeed, all through the cranberry market. And the plaintiff says that the defendants' own witnesses rec-

ognized that the demand was of the order of three million cases; that the production was nearer six million; and that the Cranberry Association members themselves were putting out three million cases and were therefore in a position to take advantage of the full current demand. And the plaintiff says that it is obvious that they did not regard anybody as being really suitable to be classified as their competitor; that Mr. Urann, when he was on the stand, said there is no competition.

The plaintiff says, look at what happened with respect to the relations between the bank, the Hyannis Trust Company, and the plaintiff. The Hyannis Trust Company had as its president Mr. Chase, who wasn't in the cranberry business, but the chairman of the board was, Mr. Makepeace, and Mr. Makepeace was affiliated with and was an officer of one of the two largest cranberry interests in the United States.

The bank lent money and in return it took bills of sale. There was a little discussion as to what the effect of its bills of sale was. It now appears that the bills of sale were not recorded as chattel mortgages and were perhaps not formally complying with trust receipts statutes in Massachusetts and therefore presumably against third persons the so-called lien created may have been ineffective with respect to either the berries or the sauce, although there may have been, as between the parties, a good lien on the berries and perhaps, though this is doubtful, a lien on the sauce.

And in 1946 there were loans made by the plaintiff company at State Street Trust Company and those loans covered the accounts receivable, not the berries or the sauce which the plaintiff was making and, according to the plaintiff's counsel—don't believe that I either endorse or reject any testimony—Mr. Chase of the Hyannis Trust Company said to Mr. Clifton of the plaintiff company that "We at the Hyannis Trust Company would like your business; why don't we get your business?"

And subsequently, after only a month or so of doing business at the State

Street Trust Company, the plaintiff corporation did all its business with the Hyannis Trust Company and two small, little accounts elsewhere on the Cape that we can ignore.

After this took place gradually additional security was asked for. First there was the security which took place in transactions in December of 1946 between the plaintiff corporation and Hyannis Trust Company. Thereafter a period of time elapsed—and I am skipping deliberately because I can't reduce six days to an hour and a half—an approach was made to the R.F.C. for a loan and in that approach the officers of the plaintiff company were originally, or shortly after their original interview, accompanied by Mr. Chase and at a later stage Mr. Makepeace was there, and a loan was made in which the R.F.C. had a small fraction of a fifth or so and a large fraction by the Hyannis Trust Company, and these mortgages to secure the loan were arranged in a conference at which there was present a lawyer who is a part-time judge, Judge Swift, and he was acting, to use a familiar phrase, as attorney for the situation. He was representing the bank and he also was representing the borrowing corporation, Cape Cod Food Products Company, and the plaintiff's stockholders, Mr. and Mrs. Clifton.

And the mortgages were given on all of the corporate property, real and personal, and except for certain Florida assets most of the real estate which was owned by Mr. and Mrs. Clifton personally—there is another side to the story and I want to caution you that I am not endorsing it because I am stating it—and a loan was made.

The loan was $150,000. And the administration of the loan was in the hands of a fellow named Logan who had been sent in as an employee of the plaintiff company but obviously acting to make sure that the bank could know that the funds were applied as intended.

And a great deal of money was used, all but about $15,000, more or less, to pay off the then existing creditors of the cor-

poration other than the bank. And no working capital was left except this few dollars, $15,000 more or less, on which no one claimed that you could carry on a very vigorous large scale enterprise.

And in 1949, as was inevitable from the beginning, if you didn't have enough working capital, says the plaintiff, there was a foreclosure and the foreclosure wiped out the corporation and the Massachusetts assets of the two individuals.

And the plaintiff says this was all foreseen and the form of the mortgages shows it. And the plaintiff says not only the form of the mortgages but, according to the plaintiff, there had been an expectation that there would be working capital available; that the letter from the R.F.C. to Mr. Chase, Exhibit G, shows that working capital was contemplated; that Mrs. Clifton discussed the subject of working capital at the conference which took place in August; that anybody who knew anything about the business knew that if working capital weren't supplied foreclosure was inevitable, and all this went, according to the plaintiff, not with the intent of furthering the banking interests of the Hyannis Trust Company, but to make sure that an actual and potential competitor wasn't able effectively to stand athwart the National Cranberry Association.

And the plaintiff says, "We have a few additional little straws we would like to show you that tend in this direction. There was a period of time when, after the 1946 season, we had on hand some cranberries and Hills Brothers, that make Dromedary Dates down in New York, wanted some of those cranberries, not fresh ones but cranberries to get into their product, and they bought 300 barrels and then they liked them and they ordered the balance, which was just under 2,700, and they offered us $25 each."

And according to the plaintiff, Mr. Clifton went around and saw Mr. Chase and Mr. Chase said, "Oh, no; those are covered by the Trust Company's mortgage. We do not approve of the sale."

Time passed. The fresh cranberries came on the market from the new sea-

son. The only possible purchaser turned out to be Mr. Urann, who paid $15 after negotiating at a price between 12 and 18. And $10 a barrel was lost, or $27,000 or a little less.

The plaintiff says, "That isn't all. There was the Cove Bog transaction. A customer was available, a lawyer named Whyte, down in New Jersey. He was really serious. He was a lawyer and knew how to write a letter and he said that provided certain matters were cleared up he was prepared to pay $65,000, $20,000, more or less, in cash, $45,000 in the form of a mortgage, and he came up with the full intent of carrying through that transaction and he sat down and negotiated or discussed the matter with Judge Swift and, after a little talk, Judge Swift, having chilled the transaction somewhat, made sure that further cold water was thrown on it by Mr. Chase at the Hyannis Trust Company, to whom Judge Swift took Mr. Whyte, and the transaction was never completed."

Now, that's the plaintiff's version.

What about the defendants? They say, "This is a very dramatic picture that you have been given but look at this realistically. Here was a company, Cape Cod Food Products, which we nursed along from the beginning and gave them money and we were in a very friendly relationship. Mr. Chase had lent money from Hyannis Trust. Mr. Makepeace and Mr. Urann cooperated and what happened was that in 1946 this crowd, Cape Cod Food Products Company, overextended itself.

"It had been in the jam and jelly business but it had never really undertaken anything like this sauce business. They got loaded up with a lot of berries at very fancy prices in a very overproduced market. At the beginning of the year they were doing all right, maybe, but, lo and behold, when the bottom fell out of the cranberry market at Thanksgiving time they were badly caught and they lost $120,000 right through the balance of that year, in six weeks. That is what they say themselves.

"What had happened is that originally the Trust Company was perfectly willing, as a financial matter, to go along on a loose arrangement of bills of sale. To be sure, they weren't very good liens, we never thought they were any good on the sauce and we weren't sure they were any good on the berries.

"We began to be worried when the market fell and we got much more worried when we started to look at what the accountant, Mr. Newkirk, who was employed by the plaintiff, who was preparing, and what Mr. Clifton was turning in to us as statements, and what was going on in that business.

"We looked and we found that all the —not all but a number of successive tabulations had errors in them. These were sometimes big errors, as big as $90,000. And each one of these errors was an error which showed the plaintiff company better off than it really was.

"Now, what we, the Trust Company, had were loans which were payable on demand and we could have called the tune right then.

"Well, instead of that, in December we thought we would straighten this thing out by getting new mortgages. And we did. Even then we didn't try to sever our relations or restrain the advance of credit. On the contrary, when the next year rolled around we went along up with Mr. Clifton and talked to the R.F.C. We helped him get credit and we gave him credit.

"And you must remember," say the defendants, "we don't know what this fellow was doing with his money previously. We do know he made enormous loans; that he borrowed, during a period of a month, loans which totaled $300,000-odd from the State Street Trust Company and, though they were never as high as $300,000 at one time, indeed not much higher than $100,000 at one time, we don't know what he was doing with that money. Perhaps he was buying up bogs or doing other things, we can't tell, and we were a little concerned about this money that we were

advancing and the R.F.C. was advancing so we put Mr. Logan in there.

"Oh, he was their employee, it is true, but Logan reported to us. And initially we thought that there were only, well, perhaps 125,000 in accounts payable and that there would be some working capital left, but it turned out that when Mr. Logan started to pay the bills he found 137,000, more or less, that would have to be paid and there wasn't working capital, but you must remember," say the defendants, "that the Cliftons were going to put in money personally, and they didn't do it.

"Now, as to these two transactions which are highlighted by the plaintiff has the plaintiff given you a correct story?" say the defendants.

Mr. Chase says he doesn't remember anything about this Hills Brothers offer of $25 and he was never told about it. And Mr. Rugg suggests to you that what actually happened is that Mr. Clifton got an offer of $25 and that, as a good Yankee trader, he was holding out for a higher price and he overstayed the market and he didn't report it to Mr. Chase because he was really waiting until he could get a better bid.

And as to this Cove Bog business, the defendants say, "What about this transaction? What is it that Mr. Clifton's company had to sell? They didn't own that whole bog; the plaintiff corporation only owned 21/32nds of the bog. The plaintiff wasn't even making accounts from time to time to the owners of the other fractions as to the receipts of that bog.

"And any lawyer from New Jersey or elsewhere who came up and learned about what those facts were and learned about the uncertainty as to whether or not the additional 11/32nds could be acquired wasn't going to go through on any such transaction. It didn't require any chilling by Judge Swift or Mr. Chase. The New Jersey lawyer, when he learned the facts, could see the whole thing for himself."

Well, ladies and gentlemen, you see that the whole thing turns on what you believe to be the intent which the defendants had in carrying on these transactions. Except for the fact as to whether the $25 offer from Hills Brothers was repeated by Mr. Clifton to Mr. Chase, there is mighty little dispute about the subsidiary facts, and when you look over the exhibits you will see that most of them have been stipulated and there is almost no disagreement as to what actually happened.

But the question is, what was the intent of the defendants. They say their intent was that which you would expect ordinary businessmen with no improper motives to have; that Mr. Urann wasn't particularly concerned—he wasn't told about most of these transactions, they say; that Mr. Makepeace clearly stayed away, he says, from Mr. Urann to avoid any entanglement between his banking and his cranberry interests and never discussed, according to him, the situation of the plaintiff; and that Mr. Chase and Mr. Makepeace were concerned about the irregularities in the reports, the insecurity of the account, the need of having collateral, the propriety of having foreclosures.

And the defendants say, "Our intent was either, in the case of some of us, to carry on the cranberry business, in the case of others of us to carry on perfectly normal banking transactions and protect our banking and commercial and financial interests."

And the plaintiff says, "There are certain aspects of these transactions which look as though they had a different color and intent. Take them as a whole, look at the more extraordinary ones and were these men acting as bankers and merely as ordinary persons conducting cranberry enterprises or was there intent to crush actual or potential competition from a fellow that was going ahead very fast in a market which was over produced and where the Cranberry Association already was producing all the market could take."

I hope I haven't told one story better than the other because I didn't mean to. You must choose between them.

■ Now, after you have considered this matter you will have arrived at one result or another; one would be, of course, favorable to the plaintiff, and then you would go on to the second and third aspects of the case. Another would be favorable to all the defendants and then you would stop, and there would be the intermediate matter that you have decided that some of the defendants had conspired and not others, and let me emphasize in the forms of the verdict that you must consider each defendant's case separately, each corporation separately, each individual separately.

On the hypothesis—and nothing more than that—that you have come to the conclusion that there was wrongdoing by two or more of the persons charged as defendants, you will then have to take into consideration what fraction, if any, of the damage suffered by the plaintiff was attributable to the wrongdoing. I can't help you. You know as much as I about the weather; you know as much as I about general economic conditions; you know as much as I about the ability, the quality of the plaintiff corporation and its stockholders; you know as much as I about the defendants' conduct. There is no magic formula, except the formula of leaving it to the jury.

The third red thread is the question of the damages, if you reach that question. And the first type of damage which it is said that the plaintiff was entitled to recover, in the view of his counsel, is the physical loss of the real estate and machinery, including of course not only the real estate on which the machinery was located but such real estate as was included within the mortgages.

And the plaintiff says to you that, Mr. Clifton says $200,000 is the fair value and that has all been wiped out, and the plaintiff says nobody set any other value.

■ As a matter of law I instruct you that you may believe the plaintiff's valuation, but you are not required to. You decide for yourself whether his valuation corresponds with your valuation. An owner of property or one who is a principal shareholder and an owner has a right to come and give you his valuation and you may think he understates it and you may think he overstates it and you may think he states it correctly; it is all up to you.

The plaintiff then says it is entitled to the loss of anticipated profits, and the plaintiff says, "We are very modest about this. We think that any fair calculation would show that we would be pretty sure to get out 45,000 cases, and we have made a calculation which has some errors in it but it is a calculation that runs from the time of the wrong done to us until the time this complaint was brought in December 1951.

"And we have made some errors, some bad ones—a $30,000 error—and we have made some understatements which weren't in our favor and we really were entitled to put the executive salaries on another basis and as to that .5050 item of overhead which there was so much talk about, well, that is a minor matter and anyway there were no errors there that amount to much.

"It is true we figured sugar and cans and caps and the like all on a uniform, level basis, from year to year. It may not be precisely accurate, but how accurate can you be in predicting profits? And we say to you that it is quite reasonable to say that in the period between the wrong done to us and 1951 we would have earned, at the least, in profits $169,-000, more or less."

The defendants have spent quite a little time pointing out what appeared to them to be obvious errors in this calculation, the degree to which it is padded, the degree to which it was prepared by Mr. Newkirk, whose accuracy or inaccuracy stands revealed to all of you from his testimony in court.

And the defendants say all this presumes that this is a profitable business. Maybe it is profitable for some but is it the business in which the plaintiff, even left alone, was able to carry on at a profit or was the plaintiff an inexpe-

rienced or overspeculative, or, on the whole, inefficient corporation?

"If profits would have been made isn't it all," says the defendants, "so speculative and uncertain and contrary to the record as not to warrant a sensible jury in awarding anything on that account?"

Now, the plaintiff doesn't make specific claims for these items but I think the plaintiff intended to include them. The plaintiff asserts, according to its evidence, that there would have been a sale to Hills Brothers at a 26,000 or 27,-000 better price than Mr. Urann ultimately gave for the 2700 barrels of berries, and this would be an appropriate item if there were a violation of the anti-trust acts and the violation chilled or interfered with this sale.

Of course the defendants say if this sale didn't go through it has nothing to do with the Trust Company, which never heard of it; it is due to a little grasping, overreaching, by Mr. Clifton, who was trying to get a little better price than the $25. It is up to you.

Then there is the question of the Cove Bog transaction. If the Cove Bog transaction would have gone through, except for the misconduct of the defendants, then the loss of profits, not the gross selling price, the loss of profits, which would have been realized, is recoverable as an item of damages.

This is a very difficult item to calculate, if we try to do it, because I have got to point out to you that the offer was for the whole bog and it isn't denied that the plaintiff didn't own the whole bog. The plaintiff would have had to require from outside interests the 11/32nds which were outstanding and might have had to make a settlement for past sums due, or might not. But remember, if you allow anything here, you can only allow the net profit of which the plaintiff was deprived.

Now, Mr. Foreman and members of the jury, this has been a long charge and it is a complicated charge. And when you go out you will carry with you the pleadings; that is, the complaint and the answer; and Stipulation No. 1, which classifies the exhibits originally offered, the 65, more or less. You will carry with you those exhibits and the other written exhibits.

You will carry with you Stipulation No. 2 and Stipulation No. 3.

Under the practice of this Court you do not take with you the oral testimony, which it so happens has been transcribed daily by the reporters.

If you do have questions, Mr. Foreman, you are authorized, after consulting your colleagues, to put such questions in writing to me and I will consider whether you should be called back into the room and I shall try to answer them and it is up to counsel to have men stand by it if they want anybody present when I talk to you further.

I hope you won't find it necessary to put questions. I think I can say that everything that you have heard in the last seven or eight days must stand in your minds with that degree of clarity that is necessary to reach a verdict.

I would be surprised if, when you get out, you are all unanimous, and I know that some of you will feel very strongly one way or the other. But I hope that you will do your very best to listen attentively to your fellows' argument, to be reasonable and to remember that you are just as good a jury as would ever be called upon to try this case.

You must not be coerced; you must not yield through fear or tiredness; but you must remember that the jury system can never work unless all in the jury box do their best conscientiously to reach a common verdict. What you do will not be perfect but if you act free of bias and prejudice, in a rational spirit and with that recognition of the high functions of a jury, I believe that you will, within a reasonable period of time, be able to return verdicts.

And now I hand you, Mr. Foreman, through the Clerk, Mr. Duwan, the forms of verdict in this case and you will notice that for each defendant there

are two forms. You will be required to fill out, for each defendant, one of the two forms. If you find that the plaintiff is entitled to prevail against any two or more defendants you will fill in the forms favorable to the plaintiff against those two or more defendants. If you find a defendant in any one of the three individual cases or any one of the four corporation cases is entitled to prevail you will fill in the form appropriate to the defendant.

In those cases, if any, where you find for the defendants you will just sign your name with no figure. In those cases, if any, where you find for the plaintiff you will fill in an item in dollars and cents and if you find a sum for the plaintiff—let us, for illustration, say XYZ dollars—you must find the identical sum against each of the defendants against whom you find.

That is to say, by way of illustration and not by way of my own view, there are seven defendants, A through G, by illustration, A, B, C, D, E, F, and G. We will assume that if you find that D, E, F and G are entitled to prevail and the plaintiff can't recover from them, then you will fill in, for D, E, F and G, verdict forms for the defendant.

On my assumption you have found for the plaintiff against A, B and C and you have found that the amount which the plaintiff is entitled to is XYZ dollars, then on the form of verdict against A, you find the plaintiff recovers against A, XYZ dollars. In the form of verdict with respect to B, you find that the plaintiff recovers against B in the sum of XYZ dollars. In the case of C, you find for the plaintiff in the sum of XYZ dollars.

You need not fear that this form of recording will treble the recoverable amount. The law will make the total recovery for the plaintiff single and will just make sure that each of the defendants, if any, that you find to be liable is liable jointly and severally for the whole amount but not with any right of treble recovery, from that fact, for the plaintiff.

Now, gentlemen, have I failed to cover something?

Mr. Rugg. I should like to be heard on that. Conference at the bench as follows:

Mr. Rugg. Before I take up as to what you failed to cover I want to except to what you did cover. You say the Capper-Volstead Act did not cover the processing of material.

The Court. Did I make a mistake on that?

Mr. Rugg. I except to it.

The Court. Did I make a mistake?

Mr. Rugg (handing). The actual process—

The Court: (Examining) Well, I think I did make a mistake but is that a relevant mistake? If you want me to, I will say something to the jury.

Mr. Rugg. I do.

The Court. I am reminded the Capper-Volstead Act does cover processing and I did erroneously state that it did not. This does not mean, either as a matter of statutory law or as a matter of a charge to you, that if the defendant association, the National Cranberry Association, were in any conspiracy with respect to credit or foreclosure or like means to eliminate a competitor, the Capper-Volstead Act gives an immunity. The immunity granted with respect to the phrase "processing" has to do with manufacturing or like activities.

Conference at the bench as follows:

The Court: Does that straighten it out from your point of view?

Mr. Rugg. I think what you said was that what you had stated about monopolistic powers of a cooperative in handling raw products did not apply to processing.

The Court. Didn't I straighten it out?

Mr. Rugg. I am not sure.

Mr. St. Clair. I think you have.

The Court. Well, you didn't object.

Mr. Streeter. I think in your example of X who was an officer of X company

and Y company, that X could be a conspirator all by himself.

The Court. I said that?

■ The Court. In case there is any doubt let me make it clear that I have never, in any form, said that one man standing alone can be a conspirator. He has to act with somebody.

Conference at the bench as follows:

Mr. Streeter. You stated that the National Association need not be a member of the conspiracy. I take it you saved our exceptions.

The Court. I intended to, and I do it again.

Mr. Streeter. I think that's all from us, your Honor.

Mr. Rugg. Do we object or except, your Honor?

The Court. Either way.

Mr. Rugg. I both object and except to your failure to give requests No. 3, 5, 6, 7, 9, 10, 13, 14, 15, 17, 18, 20, 21, 22, 24, 25. On 26 I not only except but I urge that you stated the converse but not that which I think emphasizes the omission of it.

■ The Court. In order to avoid any doubt on this point let me make it clear that if an individual who was an officer of a corporation has no connection with the action of the corporation on a particular matter except he happens to be an officer, he is not personally liable under this statute or in this complaint. To be liable an individual must either himself participate or must authorize another to act or must with knowledge of the responsibility acquiesce in the act of another with which he is affiliated as an officer or in a like relationship.

Conference at the bench as follows:

Mr. Streeter. With all due respect I wanted to get the idea that the corporation is not liable merely because an officer conspired.

■ The Court. And, vice versa, the mere fact that an individual is an officer of a corporation does not make the corporation liable unless the individual was acting for or on behalf of the corporation at the time of the acting.

Conference at the bench as follows:

Mr. Streeter. Thank you, sir.

The Court. The other exceptions are preserved, together with the full schedule of eight long pages, which are to be incorporated in the record, with the attention of the Appellate Court invited to the full scope of the exceptions taken in bulk, which are an attempt to make this Court read to the jury a charge prepared by counsel for one side.

Mr. Rugg. I further add I am making these requests because I believe they are correct statements of law as applied to the facts as presented through witnesses. I didn't complete my exceptions.

The Court. I'm sorry; go ahead.

Mr. Rugg. I stopped with 26. I further except to 27, 28, 29, 31 and 33. I have not excepted to them all, you see.

The Court. The omissions may be observed, for the record.

Mr. St. Clair. I feel I should say something, but I have nothing to say.

The Court. You will have lunch at 12:30. You are excused and will take with you the pleadings, stipulations and exhibits, which I hope I have properly kept in my custody since the clerk gave them to me. (The jury retires.)

The Court. If there is nothing else I will take a recess until such time as the jury calls me back. (Recess.)

NOTE: The jury returned a verdict for plaintiff of $175,000 single damages. For further proceedings see 119 F.Supp. 242 (award of counsel fees.) No appeal was prosecuted.