GEORGE R. WHITTEN, JR., INC., d/b/a Whitten Corporation

v.

PADDOCK POOL BUILDERS, INC., et al.

Civ. A. No. 68-695-F.

United States District Court, D. Massachusetts.

April 12, 1974.

---

John E. Lecomte, Howard A. Levine, Boston, Mass., for plaintiffs.

Paul A. Good, Butterworth & Good, Lynn, Mass., John D. Hawke, Jr., Washington, D. C., for defendant.

## OPINION

FREEDMAN, District Judge.

This civil antitrust action was commenced in August of 1968. The Court of Appeals reversed a summary judgment for the defendant in 1970 and remanded the case for trial. George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25 (1st Cir., 1970). Thereafter the case was tried before this Court, sitting without a jury, over a period of twenty-two (22) days from July 9 through August 10, 1973. After a careful review of the entire record—including the trial transcript, nearly 600 exhibits, and the briefs and memoranda of counsel—the Court has made the following findings of fact and conclusions of law.

### The Parties

The plaintiff, George R. Whitten, Jr., Inc., (Whitten), is engaged in the design, manufacture, and installation of a stainless steel swimming pool recirculation system and accessory equipment and also in serving as a general contractor for the construction of entire swimming pool facilities. Whitten, incorporated in 1964, is controlled by George R. Whitten, Jr., its president and principal

stockholder, and has its usual place of business in Bellingham, Massachusetts. Its recirculation system, known by the trademark "Uniflow," was first marketed in 1966 and patented in 1968. It should be noted that during the period covered by this action—1965 to 1971, Whitten's total sales increased from $116,653 to $650,487.

The defendants, Paddock Pool Builders, Inc., Paddock of California, Inc., and Paddock Pool Equipment Co., Inc. (hereinafter collectively Paddock), are closely affiliated separate corporations and under the control of William Baker, their principal stockholder. They are all located in Albany, New York. Paddock of California, Inc. holds the Paddock trademarks and is the licensee of a patent under which a metal swimming pool recirculation system is manufactured. Approximately thirty (30) swimming pool dealers and distributors throughout the country are franchised by this Paddock company to use the trademark and sell the Paddock products. Paddock Pool Equipment Co., Inc. manufactures and distributes swimming pool equipment and accessories, including its patented metal recirculation system, the Integrated Flow Recirculation System (I. F.R.S.). These products are sold to Paddock dealers and to independent contractors for use in residential and public pools. Paddock Pool Builders, Inc. is a swimming pool contractor and construction company which builds residential and public pools in the northeastern region of the United States. The pool equipment used in its construction is purchased from Paddock Pool Equipment Co., Inc.

*The Product*

The allegations in the complaint are directed at the marketing and distribution practices employed by Paddock in promoting its I.F.R.S. system. Whitten's Uniflow system is in competition with the I.F.R.S. system for public swimming pool business. While the two systems perform essentially the same function in much the same manner, there are clear differences between them.

Recirculation systems are designed to remove water from a swimming pool, pass it through a filter and chlorinator, and then reintroduce the filtered and chlorinated water into the pool. The basic purpose is to maintain the cleanliness and clarity of the water while losing as little as possible to waste. It is considered important to skim water from the top of the pool where most of the contaminants are concentrated, as well as to allow some water to be recirculated through the drain. In fact, this skimming from the top is now required by most state health codes for public swimming pools.

There are several methods of providing this type of recirculation. The majority of the recirculation systems now in use fit within the category of what are called conventional systems. These are systems which are fashioned from traditional swimming pool materials: tile, concrete, masonry. The conventional system requires that pipes be installed around the perimeter of the pool in order to return the clean water. In the last fifteen years the metal prefabricated pipeless recirculation gutters have entered the market and made significant inroads. These systems have the advantages of prefabrication and the fact that no pipes need to be laid around the pool. Such systems have been fabricated from galvanized steel, stainless steel, and aluminum. This development has not eliminated the conventional gutter which still enjoys a dominant role in the industry.

Whitten's patented Uniflow system first appeared on the market in 1966. The system is designed such that the surface of the water is maintained slightly above the top of the gutter. The surface water thus overflows into the gutter and is conducted through the gutter to the filter. The newly filtered and chlorinated water is returned to the pool through a plastic pipe in the gutter which has outlets for injecting the water into the pool. The gutter channel is

covered by a plastic grate with holes appropriately spaced to control the flow of water into the gutter. The grate protects the plastic pipe. The grate is not easily removed, but maintenance personnel are equipped with a special tool which facilitates such removal. The prefabricated gutter sections are joined together end to end by spot welding.

Paddock's I.F.R.S. had its beginnings in 1958 with the so-called Ogden patent. The patent was assigned to Lifetime Metal Products, Inc., an Ohio corporation. In 1963 the patent was again assigned, this time to Paddock. It has undergone some changes and modifications, but basically it embodies the original Ogden design.

The I.F.R.S. consists of an open metal gutter channel which receives water from the surface of the pool and conveys it to the filter. The filtered and chlorinated water is returned to the pool via the rectangular shaped conduit which forms the lip of the gutter. The gutter channel and return conduit are of different gauge steel and there is a continuous weld along the length of the gutter joining the two sections. During periods of quiescence the water level is below the lip of the gutter. There are openings in the gutter which permit the water to be skimmed from the surface during such periods of non-use. When the pool is in use these openings, or skimming weirs, are closed and skimming is over the gutter lip. This different method of skimmining is required since the water level rises when the pool is in use as a result of the displacement of the bodies of the bathers. This rising of the water level is referred to as "surge."

Although both Uniflow and I.F.R.S. represent a departure from conventional recirculation systems, there are substantial differences between the two systems. The following is a list of the significant differences; it is by no means exhaustive.

1. Uniflow returns the water to the pool by means of a removable plastic pipe mounted in the gutter. I.F.R.S. uses a steel conduit which forms the gutter lip.

2. Uniflow uses Type 304 stainless steel; I.F.R.S.–Type 304L. The difference is that the Paddock stock is low carbon which is desirable where there is considerable welding as there is in the I.F.R.S. design. It is not necessary where there is just spot welding as in the Uniflow system.

3. Uniflow's skimming function is accomplished by permitting the water to overflow the lip all around the perimeter of the pool. I.F.R.S. uses openings below the gutter lip (skimming weirs) placed at intervals around the pool. Paddock claims that this enables its system to accommodate the surge produced when the pool is in use without the use of a special tank called a surge tank. Whitten claims that its system performs a better job of skimming and that I.F.R.S. requires a surge tank (as does Uniflow) regardless of its claims.

4. The gutter of the Uniflow system is covered by a plastic grate; the I.F.R.S. system utilizes an open gutter. The difference is a function of the return pipe configuration: a plastic pipe which must be protected in the Whitten system; a welded part of the gutter lip in the Paddock version. Whitten claims its system is safer as a result since bathers' limbs cannot get caught in its gutter. Paddock asserts that its open gutter is preferable since it is more accessible and easier to keep clean.

These differences provide a basis upon which a prospective buyer, or architect representing a buyer, may make an informed choice of one system over the other.

*Relevant Market*

■ In cases brought under the antitrust statutes it is important to define the competitive area in which the par-

ties operate. The plaintiff argues that this market should be restricted to prefabricated pipeless pool gutters. The Court rejects this argument; it is clear that the market within which the plaintiff and defendant compete encompasses the entire public swimming pool industry.

Whenever a public swimming pool is contemplated the potential choice of gutter is not limited to Uniflow and I.F.R.S. All of the conventional tile, concrete, or masonry possibilities are available, as well as the aluminum pool offered by Chester Products. The record is replete with references to pool projects for which Whitten and Paddock had competed that were ultimately built of conventional materials. Often specifications are issued for pool bids which contain the option of bidding either a metal prefabricated system or a conventional system.

The leading case setting forth the considerations for determining the market for purposes of the antitrust laws is United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). That case was brought under the monopoly section of the Sherman Act, 15 U.S.C. § 2, alleging that Du Pont had a monopoly in the cellophane market. The Court decided that there was no monopoly since the relevant market was the flexible packaging material market which included Saran, foil, glassine, etc. The Court found that these products were subject to a cross-elasticity of demand. That is, if the price of one of these materials became too high, consumers would simply change to a competitor product.

> The "market" which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. The market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered. *Id.* at 404, 76 S.Ct. at 1012.

The plaintiff recognizes that it is competing for business with conventional gutter recirculation systems when in its catalog it states that the Uniflow system is "Equal in cost to conventional gutter construction." It is clear that the plaintiff and defendant specialize in pipeless prefabricated gutters, but it is equally clear that both are competing against the conventional gutter and other specialty manufacturers for a share of the public swimming pool market.

I find that metal prefabricated pipeless gutters do not constitute a definable submarket within the recirculation systems market. Brown Shoe Co. Inc. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

The public pool industry includes those pools which are built for governmental units, educational institutions, neighborhood groups, and clubs. The Court finds that there were 27,150 such pools built during the years 1966–1971. Of this number Paddock built 733.

*Bidding Practice in the Industry*

To understand the process within which these allegations arise, the Court will outline the procedure for awarding contracts for public pools. It is assumed that these procedures are governed by a typical state competitive bidding statute. The public body which is interested in constructing a pool first retains an architect to prepare plans and specifications for bidding. The architect may refer to Sweet's Catalog, a McGraw-Hill publication which contains brochures and specifications of manufacturers who specialize in the various areas of the construction industry. Both the plaintiff and defendant are listed in *Sweet's*. The manufacturers may receive an inquiry from the architect or they may become aware of the project through *Dodge Reports*, another McGraw-Hill service which circulates information through the industry concerning projects which are in the design and planning stage. Paddock and Whitten subscribe to this service.

Once the manufacturer or supplier becomes aware of a pending project he contacts the architect in an effort to sell his particular system. Whitten and Paddock employ salesmen and manufacturers' representatives to call on architects and engineers in an effort to convince them of the merits of their respective systems. Paddock's larger operation permits it to pursue these efforts on a greater scale than Whitten. At this stage the competition includes all types of gutter and recirculation systems—prefabricated and conventional. The suppliers offer the architect proposed specifications to be included in the bid specifications if the architect is convinced of the merits of the product. Such specifications are generally proprietary; i. e. they describe the precise characteristics of the proponent's product—often including the brand name. The architect may include these specifications verbatim in his final product since it saves him time and money to simply incorporate them as is. Once a product is specified in the plans it becomes much easier to win a contract at the time of bidding. There is vigorous competition among the suppliers and manufacturers at this point to "get specified." Often more than one system is specified. For example, Uniflow might be specified as the base bid with a conventional system as an alternate. The state public bidding laws require that a clause be included in the specifications that permits a supplier or manufacturer to bid against the specified system if it can demonstrate to the satisfaction of the owner or architect that it is the equal of the one specified.

When the specifications are put out for bids other suppliers not involved in the pre-specification stage are free to approach the architect in an effort to be certified to bid as an equal or to be specified as an alternate. A supplier who was not previously aware of a project would see the specifications reported in the Scan Microfilm Service, another McGraw-Hill publication to which both Paddock and Whitten subscribe.

With this as a background the Court will examine the specific allegations in the complaint. Counts I–III charge that Paddock and its dealers and representatives violated § 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to require the use of its specifications with the intent of excluding competitors. These counts further allege that this was done through misrepresentations, threats of litigation and harassment. Counts IV–VI allege that the same acts set forth in Counts I–III constituted an attempt to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. Counts VII–VIII charge that the defendants violated § 3 of the Clayton Act, 15 U.S.C. § 14, by requiring its customers to use Paddock accessories whenever they use Paddock's gutter system.

*Paddock's Practices*

A. *Restrictive Specifications*

The first of the practices which Whitten alleges is proscribed by the antitrust laws is the use of proprietary specifications. It is clear that the defendant does write such specifications and that they describe in detail the I.F.R.S. system. I find that the usual course in this business is to attempt to "get specified." The defendant and the plaintiff were in agreement that this was a crucial stage in obtaining a contract. Before the specifications are issued is when the competition is keenest. The purpose of this pre-specifications activity is to sell the system. A successful sales job at this point results in proprietary specifications being adopted by the architect.

I find that both Paddock and Whitten engage in this practice. When one is successful and is specified the proprietary specifications make it difficult for the competition to qualify to bid. For example, Paddock specifies Type 304L stainless steel; Whitten specifications require Type 304. Paddock calls for an open gutter; Whitten specifies that the gutter shall be covered. These differences in the proprietary specifications point up the fact that the systems are different.

After a set of specifications has been accepted by an architect a disappointed contractor or supplier still has ample opportunity to sell his system. In the first place, the architect is not required to adopt the specifications *in toto*. Architects and engineers are trained professionals and, while it is true that they are not always knowledgeable with regard to pool construction, their general knowledge of the construction industry permits them to make informed judgments on which recirculation system will best serve their clients at the lowest cost.

In the event that specifications have already been issued when Whitten hears of the project, it may attempt to qualify under the "or equal" clause or convince the architect to issue an addendum to the specifications which permits Whitten to bid as an alternate. An architect can waive specifications, and often does so. The decision as to whether a supplier will be permitted to bid or whether a specification will be waived is that of the architect, not that of the specified supplier.

The plaintiff complains that Paddock's specifications go beyond being merely proprietary in that they negatively exclude Whitten's product. For example, Paddock's specifications require ". . . that no screws, slip joints, or mixtures of metal and plastic will be permitted." Screws, slip joints, and plastic are features contained in the Whitten system. I find that these negative specifications are common business practice and that Whitten engages in this same practice.

The Court of Appeals, in remanding this case for trial, assumed that the "or equal" clause was rendered meaningless by proprietary specifications. George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25, 28 (1st Cir., 1970). I find that the fact is that these specifications can be and have been overcome by vigorous salesmanship efforts. It is further established by the evidence that the architect will waive specifications in order to obtain a better product for his client.

The plaintiff has introduced evidence of instances in which it was excluded from bidding because it could not convince an architect that its product was the "equal" of the defendant's specific system. As pointed out earlier in this opinion, there are differences in the systems upon which an architect could base a decision to specify one to the exclusion of the other. It is clear that Paddock and Whitten are "equal" by some standards and not equal by others. This is evident from the fact that while they perform essentially the same function, they are both patented. The burden is on the supplier who has not been specified to convince the architect that his product is equal for the purposes of the particular project. This reduces itself to a matter of salesmanship.

### B. *Controlling Prices in Restraint of Trade*

The plaintiff has introduced no competent evidence to show that the defendant has been able to control prices.

### C. *Misrepresentations*

The plaintiff charges that Paddock has engaged in material misrepresentations both as to itself and as to Whitten. The Paddock claim of being in business since 1920 was the subject of a good deal of testimony. The old Paddock of California, a company in business since 1920, went into receivership in 1962. William Baker, the principal stockholder of the three present Paddock companies, through his Paddock Pool Builders Equipment Company, purchased from the receiver the name, trademarks, patents, much of the inventory, and the franchise agreements. The cost of this purchase over a 10-year period was in excess of $750,000. Many of the key personnel from the old Paddock company were employed by Baker after the transaction. There is substantial continuity between the old Paddock of California and the present Paddock companies. I find that the defendants have not mate-

rially misrepresented their experience in the swimming pool industry.

The plaintiff charges that Paddock has falsely claimed to have a "national swimming program" and that it makes the "only pipeless" swimming pool. The Court finds that these allegations are similarly without merit as misrepresentations.

The defendant's claims with respect to its own technical capabilities and Whitten's technical shortcomings were the subject of exhaustive expert testimony. The Court will not attempt to deal with this evidence in detail. Suffice it to say that both sides of such questions as Paddock's in-pool surge capacity and Whitten's flooded gutter and "cleanability" problems had merit; that interpretation of the data could lead one to either conclusion. I find no material misrepresentation with respect to these claims. Such representations fall more aptly into the category of "seller's talk." The Court of Appeals noted that " . . . Systematic tale-telling coupled with other relevant factors such as conspiracy or monopoly power may constitute an antitrust violation." George R. Whitten Jr., Inc. v. Paddock Pool Builders, Inc., *supra*, at 29, fn. 3. The evidence did not reveal such "tale-telling."

D. *State University Construction Fund (S.U.C.F.)*

One transaction to which the plaintiff points as an example of anti-competitive conduct of the defendant is that involving the State University Construction Fund of the State of New York. In 1969 this body commissioned a report on swimming pool construction to be used as a guide for architects in order to provide some continuity among the various projects which were then being planned. The plaintiff contends that the defendant unduly influenced this report.

The preparation of the report was in the hands of outside consultants to the S.U.C.F.—an architect and an engineer. While these men exercised control over the project, the actual preparation and writing of the report was done by a plumbing designer employed by the engineering firm. J. Gregory Horine, Equipment Coordinator for the S.U.C.F., heavily influenced the stainless steel gutter section of the report. Mark Randall, swimming coach at Colgate University and a pool consultant to the S.U.C.F., was also involved in the writing of the report.

The plaintiff charges that Horine and Randall were closely affiliated with Herbert Ellis, president of Paddock Pool Builders, Inc., and that this association resulted in a a report that was unduly critical to Whitten and weighted in favor of Paddock. I find that Randall and Horine did influence the report and that this was done with the knowledge, encouragement and cooperation of Herbert Ellis. While it has not been established that Horine and Randall received anything for their efforts on Paddock's behalf in this matter, it is clear that they did not approach the Whitten-Paddock comparison with impartiality.

The report, "Swimming Pool Study—Phase I," was published in September 1969. It showed Paddock in a most favorable light and focused on the weaknesses of the Whitten system. I do not find that there were misrepresentations as to the specific statements made, but I do find that the plaintiff was treated unfairly.

Paddock, aware before publication of its favorable endorsement in the report, asked for and received permission to distribute the pamphlet to dealers and customers. This permission was granted by S.U.C.F. on December 3, 1969 in return for a "hold harmless" agreement by Paddock. The Fund soon became aware of the unfair character of the report and terminated Paddock's permission to distribute it on January 8, 1970. By that time Paddock had distributed in excess of 800 copies.

E. *Threats of Litigation*

Plaintiff's principal example of threats of litigation involves patent infringement. Prior to Whitten's obtain-

ing a patent for its system in 1968, patent counsel for Paddock wrote to Whitten informing it that its design might be infringing the Ogden patent. At the time, Whitten's gutter more closely resembled the I.F.R.S. than it now does. While this patent issue was pending, defendant so informed potential customers. There is no evidence of the use of threats of patent litigation after 1968. I find that this patent issue was a valid one and that the defendant was in good faith in raising it.

Other references to threats of litigation are vague and not sufficiently developed by the evidence to support a finding by the Court. Such threats, where they do appear, are the natural consequence of the vigorous competition in which the parties are engaged. I find that there was not a pattern of anti-competitive conduct based upon such threats.

F. *Massachusetts Department of Public Works Pools*

In 1967, the Massachusetts Department of Public Works began a swimming pool building program. There were five pools to be built in the initial phase of this project. The department retained the architectural firm of Munson and Mallis in Springfield, Massachusetts to design the pools and prepare the specifications. A Pennsylvania architect, Sherman Patterson, associated with the Munson firm, acted as pool consultant.

Mr. Patterson, while he is not related to James Patterson of Lifetime Metal Products, Inc. (Paddock's licensor and franchisee in Ohio), has been associated with the latter Patterson in the past as a pool consultant. Some of the improvements in the Ogden design had been originally suggested by Sherman Patterson to James Patterson prior to the time Paddock became the licensee. This association with the early I.F.R.S. design causes him to view the system favorably.

The specifications for the pools prepared by Patterson were not the I.F.R.S.

specifications, but were a variation of the same system which the architect calls the "Sherman Patterson" design. Paddock was listed as a source of supply for the materials. There was an "or equal" clause in the general specifications.

Whitten attempted to be specified at the outset. There is no evidence as to what steps it took prior to the issuance of the specifications, however. After the specifications were out, it attempted to qualify as an "equal." Patterson, as the architect, had the last word in this matter, and determined that Whitten was not an equal.

Later, when another series of pools was being prepared for bid, Patterson listed modifications which the Whitten system would be required to undergo in order to be considered an equal. This change of policy by the architect was in response to repeated attempts by Whitten to get the state to intervene.

Whitten refused to accept these conditions since the modifications would have made its system into the Paddock system. It was not permitted to bid on the second series of pools, but its continued pressure on the Department of Public Works resulted in its being approved as an equal on a third series of pools.

As a result of his long standing association with the Ogden patent, Sherman Patterson was a proponent of the system before Paddock and Whitten arrived on the scene. This was an unfortunate circumstance for Whitten. From the evidence presented, I find that Patterson's plans and specifications were a product of his experience and professional judgment. He treated Whitten's system in a manner consistent with his duty as project architect. As has been noted throughout this opinion, there are differences in the two systems and those differences provide a valid basis for choosing one over the other. There is no evidence which would support a finding that Patterson was unduly influenced in the performance of his duties in this matter.

The plaintiff introduced evidence which tended to show that Herbert Ellis of Paddock Pool Builders, Inc. had attempted to influence George Sheehan, an employee of the Department of Public Works, who acted as liaison between Massachusetts and the pool consultant firm. The Court finds that Mr. Ellis attempted to give a set of golf clubs to Mr. Sheehan, but that this gift was not accepted. Sheehan was familiar with some of the technical differences between the Whitten and Paddock products. I find that this was the result of vigorous sales efforts which were pursued by the Paddock organization. As the representative of the owner of the pools, Sheehan was the natural target for the I.F.R.S. sales pitch.

### G. *Scan Microfilm Incident*

The plaintiff introduced testimony by way of deposition concerning an alleged attempt by Paddock to tamper with the edit which Whitten received from the McGraw-Hill Scan Microfilm Service. Scan provides its subscribers with specifications for construction jobs which have been issued for bid. Whitten's edit called for swimming pool projects with "metal gutters only." There was some evidence of correspondence between Paddock and McGraw-Hill initiated by Paddock's Robert DeRose pertaining to Whitten's edit. The evidence is inconclusive as to what precipitated this exchange between Paddock and Scan. It is clear that nothing was done as a result of this incident which affected Whitten's scan edit.

### H. *Fort Dix—Fort Devens*

The plaintiff contends that specific anticompetitive conduct by the defendant resulted in the loss of the opportunity to bid on a swimming pool project at Fort Dix, New Jersey. Two projects were to be built by the Department of the Army—one at Fort Dix, New Jersey; the other at Fort Devens, Massachusetts. There was a two-step procedure in the bidding: (1) design proposals were submitted for approval; and (2) once the designs were approved, bids were requested. The design proposals were subject to non-disclosure; i. e. the plans were confidential prior to the opening of the bids.

The Fort Devens job was bid on May 6, 1971. Paddock registered an official protest when the bids were opened and Whitten's bid was low. Its letter of protest, dated April 6, 1971, and delivered at the bid opening on May 6, establishes the fact that Paddock had seen the plaintiff's plans prior to that date and during the period of non-disclosure. There was no explanation as to how this came about. After a period of delay to process this protest, Whitten was awarded the contract.

The plaintiff was required to extend its bid and the payment and performance bonds were issued by its surety company. Whitten was close to its bonding limit with the Fort Devens job and the delay forced by the Paddock protest caused its insurance company to refuse the bond it had requested for the Fort Dix project. I find that Paddock had a right to protest the bid and to consider an appeal through the courts. There has been no showing that the defendant was aware of Whitten's bonding problem or that it protested for the purpose of bringing about such a result.

### I. *Tying Agreements*

The essence of the plaintiff's allegation of tying agreements is that the standard Paddock specifications contain a requirement that the source of supply for the recirculation system and accessories shall be a single manufacturer. As with the other proprietary specifications, they are subject to pre-specification competition, and the right of the architect to waive such a specification, to issue an addendum without such a requirement, or to simply refuse to accept specifications *in toto* as offered by the manufacturer.

Further, the use of a single supplier (a specification used by both Whitten and Paddock) is common in the industry

to facilitate servicing and warranty claims. The Court finds that there is no evidence that Paddock refused to deal with a potential customer as a result of a refusal to accept all the Paddock accessories with its recirculation systems. On the contrary, there is evidence that other manufacturer's equipment was specified with Paddock's gutter on numerous occasions. I find that Paddock imposes no condition that a customer must buy the entire package in order to purchase the patented I.F.R.S. gutter.

*Conclusions*

■ This action has been brought under the treble damage section of the Clayton Act, 15 U.S.C. § 15. Recovery by a private party under this section depends upon its establishing by a preponderance of the evidence: (1) a violation of the antitrust laws; (2) substantial injury to the plaintiff proximately caused by this violation; (3) the extent of damages. Cape Cod Food Products, Inc. v. National Cranberry Association, 119 F.Supp. 900 (D.Mass., 1954).

■ In order to sustain its burden with respect to Counts I through III of the complaint, the plaintiff must demonstrate that the defendant has imposed a " . . . restraint of trade or commerce among the several States . . . " 15 U.S.C. § 1. Whether or not a restraint proscribed by the antitrust laws has been shown must be determined by an examination of the particular industry. This rule was first set forth by Mr. Justice Brandeis in Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

. . . the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or

probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

■ Certain practices are so repugnant to the antitrust laws that they have come to be considered as *per se* violations. These include such practices as price fixing (United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)), group boycotts (Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)), and tying agreements (White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963)). Although allegations were made that price fixing and tying agreements were a part of the defendants' antitrust conduct, the Court found no evidence which would support such claims.

■ A practice which is not illegal *per se* may nonetheless constitute a violation of the statute if it is an unreasonable restraint on free competition. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The plaintiff's principal contention of an unreasonable restraint centered around the defendant's use of proprietary specifications.[1] After careful consideration of all the evidence, I conclude that the use of those specifications in the context of the present case does not violate the antitrust statutes.

There were specific instances of conduct on the part of the defendant which were distasteful to the Court. In this category I include: (1) defendant's attempt through Herbert Ellis to influence the writing of the State University Construction Fund Swimming Pool Study report; (2) Ellis' unaccepted offer of a set of golf clubs to George Sheehan of the Massachusetts Department of Public

---

[1] See several recent cases also dealing with the issue of proprietary specifications: Kendall Elevator Co., Inc. v. LBC & W Associates, 350 F.Supp. 75 (D.S.C., 1972) ; Federal Sign and Signal Corporation v. Bangor Punta Op-

erations, Inc., 357 F.Supp. 1222 (S.D.N.Y., 1973) ; Security Fire Door Company v. County of Los Angeles, 484 F.2d 1028 (9th Cir., 1973).

Works; (3) Ellis' knowledge of the plaintiff's plans for the Fort Devens project despite the fact that the designs were subject to nondisclosure. These kinds of acts, however, do not amount to conduct violative of 15 U.S.C. § 1. This is not to say that there may not be a remedy available to the plaintiff. I find only that the plaintiff has not met its burden under the antitrust statutes.

■ The plaintiff, in Counts IV–VI, charges that the defendant has attempted to monopolize the market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. To establish an attempt to monopolize there must be a specific intent and a dangerous probability of success.

The requirement of specific intent to monopolize was first announced in Swift & Company v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905). The plaintiff points to the conduct of the defendant as demonstrating this intent. From the findings I have made with respect to the activities of the defendant, I conclude that no such intent to monopolize has been shown.

> Neither rough competition nor unethical business conduct is sufficient. The requisite intent to monopolize must be present and predominant. American Football League v. National Football League, 205 F.Supp. 60, 65 (D.Md.1962), aff'd 323 F.2d 124 (4th Cir., 1963).

Swift & Company v. United States, *supra*, further requires that a dangerous probability of monopoly exist in order to establish an attempt.

> But when that intent and the consequent dangerous probability exist, this statute . . . directs itself against that dangerous probability as well as against the completed result. *Id.* 196 U.S. at 396, 25 S.Ct. at 279.

It is clear from the size of the public swimming pool market (27,150 pools built from 1966 to 1971), that no such dangerous probability of monopoly exists.

Plaintiff has failed to establish by a preponderance of the evidence that the defendant has committed those violations of the antitrust statutes alleged in the complaint. In view of this finding on the issue of liability the Court need not reach the question of damages. However, in order to complete a full consideration of this matter, the Court will enter its findings thereon.

*Damages*

Even if the plaintiff had met its burden as to the anti-competitive practices that it had alleged, the evidence relating to damages left much to be desired. During discovery, Whitten had indicated that it was relying on a specific list of damage jobs for which it had been deprived of contracts as a result of the defendant's conduct. This list was comprised of 41 pool jobs as the result of an order of the Court dated November 19, 1971. The plaintiff offered no evidence of the reasons for losing the specific jobs; it seemed to rely upon its general proof of Paddock's conduct to supply the element of causation. Although the plaintiff did not address its proof to the "damage" jobs, the defendant introduced evidence either by live testimony or designated deposition which tended to rebut the plaintiff's allegations of anti-competitive practices with respect to the specific jobs.

Whitten's proof on the measure of damages was introduced through a certified public accountant, Seymour Levinson. Mr. Levinson, Whitten's accountant since 1972, had devised a different theory of damages. He had had no previous antitrust damage experience, but he was familiar with the calculation of business interruption damages for insurance purposes.

Levinson used the specifications for 339 jobs which had been given to him by the plaintiff. These represented the total number of jobs of which the plaintiff had knowledge during the period from 1965 through November, 1971. The plaintiff had informed the accountant

that of this total number, 117 contained specifications which were "competitive" and 222 were "restricitve" (i. e. Paddock's proprietary specifications). Levinson subtracted 15% of the jobs—a figure which Whitten had told him represented the number of jobs which are never built. He computed a "success, rate" of 46.5% on the competitive specifications. This success rate was then applied to the total market to arrive at Whitten's total share of the market if all the specifications had been competitive. It was assumed that the only two competitors in the field were the plaintiff and the defendant. The 339 jobs were all stainless steel gutters and they had come to Whitten's attention principally through the plaintiff's Scan Service edit.

To establish the total market for all stainless steel gutter projects, Whitten's and Paddock's sales were combined. From this total was subtracted 16.85% which represented the plaintiff's private sales and which Levinson assumed to be Paddock's private sales. The total market, then, was $30,773,653.00. Whitten's share should be 46.5% or $14,309,749.00. From the $14,309,749.00 Levinson subtracted the plaintiff's actual sales, $1,871,467.00 and arrived at total lost sales of $12,438,102.00. He determined a net before tax profit percentage by taking the actual profit which Whitten had, plus all its legal expenses, and one-half the salaries of George Whitten and his assistant for the period in question. This was what Whitten estimated was spent to counter the anti-competitive activities of the defendant. Thus computed, the profit percentage was 5.8%. [Without salaries and legal expenses added back in, the figure would have been 2.8%.] 5.8% of $12,438,102.00 gives a total damage figure of $721,410.-00.

The Court finds that this theory of the measure of damages is unsound in several respects. Whitten had informed Levinson that the total market for stainless steel gutters included only Paddock and Whitten. While it would not be unreasonable to conclude that only the plaintiff and the defendant are actively engaged in the manufacture of prefabricated stainless steel recirculation gutters, this Court has found that the market for such systems includes the entire public swimming pool market and is not coextensive with the number of jobs which Whitten and Paddock have been able to secure. The lack of comparability of Paddock and Whitten was not factored into the theory. Paddock has a much more extensive manufacturing facility and a larger product line. It includes a nationwide franchised dealer organizaton as well as a contracting company which builds a large number of public and residential pools. There was no evidence as to what part of Paddock's business deals with the I.F.R.S. gutter.

Mr. Levinson assumed from the information provided by Whitten that, but for the 15% of the jobs which were never built, all the rest of the jobs not awarded to Whitten went to Paddock. I find that this was not the fact; that some of the jobs went to other contractors or suppliers. Further, it was established that some of those jobs which were classified as "restrictive" for purposes of the damage theory were later subject to addenda approving the plaintiff as a qualified bidder. All of the jobs in the list of 339 included an "or equal" clause. Finally, there are several jobs in the list of "restrictive" specifications which provided for both Whitten and Paddock bids. These clearly belonged in the "competitive" list.

 It is well settled that damages need not be demonstrated with absolute certainty and this is especially true in antitrust cases. Momand v. Universal Film Exchanges, Inc., 172 F.2d 37 (1st Cir., 1948).

. . . while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. Story Parchment Co. v. Paterson Co., 282 U.S. 555, 563, 51 S. Ct. 248, 250, 75 L.Ed. 544 (1931).

The theory of damages advanced by the plaintiff is difficult to separate from the question of liability because of the plaintiff's reliance upon the restrictive/competitive distinction and relevant market in calculating its damages. Had the Court found for the plaintiff on the issues of liability and causation it is clear that recovery would have been far short of the $721,000.00 sought by Whitten.

However, despite the apparent flaws in the plaintiff's theory of damages, there is some evidence before the Court from which it could have computed a reasonable award.

> The law has gone far to ease that burden by permitting proof of losses which border on the speculative, in order to implement the policy of the antitrust laws. Momand v. Universal Film Exchanges, Inc., supra, at 43.

Let me reiterate, however, that my findings on the issue of liability preclude the necessity for such a computation.

In accordance with the foregoing findings and conclusions, the Court orders judgment to be entered for the defendant, without costs.