**ATLANTIC HEEL CO., Inc., Plaintiff, Appellant,**

v.

**ALLIED HEEL CO., Inc., et al., Defendants, Appellees.**

**No. 5713.**

United States Court of Appeals First Circuit.

Dec. 15, 1960.

———◆———

Claude B. Cross, Boston, Mass., with whom John M. Reed and Withington, Cross, Park & McCann, Boston, Mass., were on brief, for appellant.

Edward L. LaVine, Boston, Mass., with whom Samuel Markell, Joseph B. Abrams and Goulston & Storrs, Boston, Mass., were on brief, for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Massachusetts dismissing plaintiff's complaint for failure to state a claim under the Sherman Act, 15 U.S. C.A. § 1.

Plaintiff-appellant, Atlantic Heel Co., Inc., filed a complaint alleging that plaintiff is a Massachusetts corporation engaged in the manufacture and sale of leather and leatherboard heels; that its plant is located in Boston; its suppliers and customers are located in several states; it is a leading concern in the supply of leather and leatherboard heels, and has a substantial share of the interstate business in the related lines of merchandise.

The complaint further alleges that defendants conspired and are conspiring to restrain the plaintiff in its interstate and foreign business, more particularly that defendants conspired to destroy plaintiff in its interstate and foreign business, and in furtherance of this purpose (1) established a business competitive with that of plaintiff, originally operated as a partnership by some of the defendants, and presently expanded and operated also as defendant Allied Heel Co., Inc., a Massachusetts corporation; (2) defendant Irving J. Keiter, acting for himself and for the other defendants induced and enticed the superintendent of plaintiff's factory and other key employees to leave plaintiff and work for defendant Allied, and as a consequence the quality and volume of plaintiff's production was impaired, and plaintiff had to make expenditures which otherwise would have been unnecessary; (3) defendant Irving J. Keiter, at the instigation and in behalf of all the defendants, visited plaintiff's plant without plaintiff's acquiescence or consent for the purpose of obtaining valuable and confidential trade secrets; (4) all the defendants have disparaged plaintiff and its products by intentionally false statements relative to plaintiff's financial standing and other matters to persons including established customers and suppliers of plaintiff, with the result that

plaintiff's relations with its customers and suppliers have been damaged; (5) defendants Keiter, acting for themselves and the other defendants, solicited salesmen who had been commission representatives of plaintiff to induce, and did induce two such salesmen, to cease representing plaintiff and undertake representation of defendant Allied with the result that plaintiff has lost valuable business in those territories; (6) defendants Keiter, acting for themselves, and on information and belief in behalf of the other defendants, instituted, in bad faith, a suit against plaintiff and plaintiff's president with the intent and purpose of damaging plaintiff by false allegations as to diversion and waste of corporate funds and by a request for a receiver, with the result that plaintiff has been damaged in its relations with customers and suppliers; (7) on information and belief that one or more of defendants Keiter, acting for themselves and in behalf and at the instigation of the other defendants, interfered with plaintiff's sources of supply of raw materials, causing delay in the filling of plaintiff's orders to such suppliers, with the intent and effect of rendering plaintiff unable to meet its customers' orders, resulting in the cancellation of orders by plaintiff's customers and loss of their future business; (8) defendants Keiter and Allied on information and belief falsely represented that defendant Allied was a branch or otherwise affiliated with plaintiff in order to obtain credit for defendant Allied with suppliers, utilities and others; (9) one or more of defendants Keiter acting for themselves and at the instigation of the other defendants visited plaintiff's plant at various times to interfere with plaintiff's employees in the performance of their duties by making disparaging remarks concerning plaintiff and plaintiff's president and statements intended to disturb or distract such employees from their regular functions, resulting in a loss of quantity and volume of plaintiff's production and attendant loss of profits; (10) defendant Irving J. Keiter in behalf of himself and the other defendants violated his fiduciary duty to plaintiff as a director by performing the acts attributable to him during his tenure as director of plaintiff. The complaint further alleges that course of action undertaken by defendants has had and will have the effect of eliminating plaintiff from and restraining plaintiff in its position as one of the leading concerns in the supply of leather and leatherboard heels; that such elimination and restraint will injure the interests of the public and the trade by removing a substantial supplier of materials for the shoe industry in interstate commerce with a resultant harmful effect on prices and on the availability of choice to customers in the trade. Plaintiff alleges it has suffered damages in the amount of $250,000 and seeks judgment for treble damages, an injunction, costs and reasonable attorney's fees.

Defendants filed a motion to dismiss the action under Rule 12(b)(6) F.R. Civ.P., 28 U.S.C. for failure to state a claim under Title 15 U.S.C.A. §§ 1, 15 or 26 upon which relief could be granted by the district court. The district court in a brief memorandum decision held that "the allegations are deemed insufficient to bring the case within the scope of the federal antitrust laws" and a judgment of dismissal was entered on June 8, 1960.

The question presented on this appeal is whether or not the complaint sufficiently alleges a violation of Section 1 of the Sherman Act, 26 Stat. 209 as amended, 15 U.S.C.A. § 1.

In Mitchell Woodbury Corp. v. Albert Pick-Barth Co., 1 Cir., 1930, 41 F.2d 148, 151 this court held sufficient a complaint which alleged a conspiracy to restrain the interstate trade of the plaintiff and to destroy its trade in kitchen equipment and utensils. This court there said:

"Here the alleged intent of a conspiracy between the defendants was to destroy the competition of the plaintiff and deprive it of its interstate business. If proven as alleged, it was an unlawful purpose, an undue interference with interstate commerce, and to that extent is injurious

to the public interest, which is entitled to the free and full flow of interstate trade, subject only to such effect as natural and reasonable competition may have upon it."

The complaint there alleged that the defendant "was one of a combination of corporations of similar name and allied interests engaged in the same business as the plaintiff, and constituted the largest and dominating factor in that trade throughout the United States; * * *" Id., at page 149. Although this allegation is mentioned by the court, it does not seem crucial to the court's analysis of the gravamen of the alleged violation of the antitrust laws.

After a trial on the merits, judgment was entered for the plaintiff despite a special finding by the jury that "the acquisition of the plaintiff's business did not effect an unreasonable restraint of trade." On appeal, this court said in Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 1 Cir., 57 F.2d 96, 102, certiorari denied 1932, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288:

> "To constitute an offense under section 1 of the Sherman Act, it is not necessary, if a conspiracy is proven, the purpose and intent of which was to eliminate by unfair means a competitor in interstate trade, to show that the public was affected, and to what extent. Nor is it necessary under this act, as it is at common law, to prove any overt acts in order to constitute the offense defined in section 1; but if overt acts are proved in furtherance of the offense defined in section 1, and any one is thereby injured in his business or property, the conspirators under section 7 of the Act are liable therefor."

Since Mitchell Woodbury Corp. is so closely similar to the facts alleged in the instant case, we are warranted in reversing the lower court unless there are persuasive arguments for repudiating the view we held there.

In Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, the Supreme Court held that the members of a labor union who, for the purpose of unionizing a factory the business of which was largely interstate, engaged in a protracted sit-down strike forcing the suspension of the interstate business, and who explicitly refused requests to allow removal of finished merchandise for fulfillment of interstate orders, were not engaged in a conspiracy in restraint of trade within the meaning of the Sherman Act. The Court's opinion contained the following language:

> "* * * The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury." Id., 310 U.S. at page 493, 60 S.Ct. at page 992.

> "* * * In the cases considered by this Court since the Standard Oil case [Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619] in 1911 some form of restraint of commercial competition has been the *sine qua non* to the condemnation of contracts, combinations or conspiracies under the Sherman Act, and in general restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price. It is in this sense that it is said that the restraints, actual or intended, prohibited by the Sherman Act are only those which are so substantial as to affect market prices. Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition. * * *" Id., 310

U.S. at pages 500–501, 60 S.Ct. at page 996.

" * * * And in any case, the restraint here is, as we have seen, of a different kind and has not been shown to have any actual or intended effect on price or price competition." Id., 310 U.S. at page 504, 60 S.Ct. at page 998.

" * * * Underlying and implicit in all of them is recognition that the Sherman Act was not enacted to police interstate transportation, or to afford a remedy for wrongs, which are actionable under state law, and result from combinations and conspiracies which fall short, both in their purpose and effect, of any form of market control of a commodity, such as to 'monopolize the supply, control its price, or discriminate between its would-be purchasers'. * * * " Id., 310 U.S. at page 512, 60 S.Ct. at page 1002.

Following the Apex Hosiery case there were several cases which more or less relied on the principles quoted above and applied them in support of holdings that complaints alleging conspiracies to restrain interstate trade were insufficient to charge a violation of the Sherman Act since there was a failure to "allege facts from which it could be determined as a matter of law that a combination or conspiracy was entered into which brought about an increase in prices to the consuming public, a diminution in the volume of merchandise in the competitive markets, a deterioration in the quality of the merchandise available in the channels of commerce, or any other like evil consequence in the free flow of interstate commerce." Shotkin v. General Electric Co., 10 Cir., 1948, 171 F.2d 236, 239. See also Feddersen Motors v. Ward, 10 Cir., 1950, 180 F.2d 519; Schatte v. International Alliance, etc., 9 Cir., 182 F.2d 158, certiorari denied 1950, 340 U.S. 827, 71 S.Ct. 64, 95 L.Ed. 608; Klor's, Inc. v. Broadway-Hale Stores, 9 Cir., 1958, 255 F.2d 214, reversed 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741; Swartz v. Forward Ass'n, D.C.D.Mass.1941, 41 F.Supp. 294.

Recently, however, the Supreme Court in Klor's, Inc. v. Broadway-Hale Stores, 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed. 2d 741, held sufficient a complaint that alleged that the defendants, a retail department store chain, and several manufacturers and distributors of household appliances, had conspired among themselves either not to sell appliances to plaintiff, a single retail store outlet located next door to one of the chain's department stores, or to sell to plaintiff only at discriminatory and highly unfavorable terms, that the defendant retail chain used its monopolistic buying power to bring about the above situation, that the appliance business was in interstate commerce and the concerted refusal to deal with plaintiff had seriously handicapped plaintiff's ability to compete and caused it loss of profits. The Court rejected the basis of the lower court's dismissal, i. e., that "there was no charge or proof that by any act of defendants the price, quantity, or quality offered the public was affected, nor that there was any intent or purpose to effect a change in, or an influence on, prices, quantity or quality." Id., 359 U.S. at page 210, 79 S.Ct. at page 708. The Court stated:

" * * * This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale and in some instances forbids them from selling to it on any terms whatsoever. It interferes with the natural flow of interstate commerce. It clearly has, by its 'nature' and 'character,' a 'monopolistic tendency.' As such it is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. * * * "

Id., 359 U.S. at page 213, 79 S.Ct. at page 710.

In regard to the Apex Hosiery case, the Supreme Court said:

"The court below relied heavily on Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, in reaching its conclusion. While some language in that case can be read as supporting the position that no restraint on trade is prohibited by § 1 of the Sherman Act unless it has or is intended to have an effect on market prices, such statements must be considered in the light of the fact that the defendant in that case was a labor union. The Court in Apex recognized that the Act is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations, like labor unions, which normally have other objectives. * * *" Ibid., note 7.

Thus insofar as the cases following Apex relied on a broad requirement of effect on prices, quantity and quality they must be rejected. It might be noted, however, that the Klor's case involved a group boycott or concerted refusal to deal. The Court said Id., 359 U.S. at page 212, 79 S.Ct. at page 709:

"Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they 'fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality.' * * *"

The question for our decision is whether or not the allegation of a conspiracy to destroy a competitor as alleged here is a *per se* violation of § 1 so that the rationale of the Klor's case applies, and, thus, no allegations of further facts showing the basis of public harm and consequent unreasonableness of the restraint are necessary.[1]

In Northern Pac. R. Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 the Supreme Court said in regard to the *per se* violation doctrine:

"The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. And to this end it prohibits 'Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States.' Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition. * * *

"However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints

1. The cases cited above as following Apex Hosiery did not explicitly hold that a conspiracy to destroy or restrain a competitor was not a *per se* violation, but rather held that the particular complaint did not come within the Apex Hosiery concept of public injury. Therefore, reference must be made to the cases defining *per se* violations to see if there is any persuasive authority contrary to our decision in Mitchell Woodbury.

which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable— an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, 60 S.Ct. 811, 84 L.Ed. 1129; division of markets, United States v. Addyston Pipe & Steel Co., [6 Cir.] 85 F. 271, 46 L.R.A. 122, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; group boycotts, Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949, and tying arrangements, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20." Id., 356 U.S. at pages 4–5, 78 S.Ct. at page 517.

In the often cited case of Standard Oil Co. v. United States, 1911, 221 U.S. 1, at page 58, 31 S.Ct. 502, at page 515, 55 L.Ed. 619, the philosophy of the Sherman Act was thus stated:

"Without going into detail, and but very briefly surveying the whole field, it may be with accuracy said that the dread of enhancement of prices and of other wrongs which it was thought would flow from the undue limitation on competitive conditions caused by contracts or other acts of individuals or corporations, led, as a matter of public policy, to the prohibition or treating as illegal all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, but, on the contrary were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy. * * *"

Viewing the conspiracy alleged in the instant case, we believe that the purpose of destroying a competitor by means that are not within the area of fair and honest competition is a purpose that clearly subverts the goal of the Sherman Act. It constitutes an interference with the natural flow of interstate commerce which would exist under conditions of fair and honest rivalry for the buyer's trade. See Package Closure Corporation v. Sealright Co., 2 Cir., 1944, 141 F.2d 972, 977–978.

Viewing the decisions expounding the philosophy of the Sherman Act and *per se* violations of it, we are convinced that the holding of this court in Mitchell Woodbury is correct and should be applied to the instant case.

We believe that the complaint in the instant case alleges a conspiracy to destroy a competitor by means so inimical "to free and full flow of interstate trade" as to constitute a *per se* violation of Section 1 of the Sherman Act. See also Cleaves v. Peterboro Basket Co., D.C. D.N.H.1931, 54 F.2d 101.

Judgment will be entered vacating the judgment of the district court and remanding the case for further proceedings not inconsistent with this opinion.

WOODBURY, Chief Judge, and ALDRICH, Circuit Judge (concurring).

Judge ALDRICH and I concur in the result but see no occasion at this stage of the case to express wholehearted en-

dorsement of the rule laid down by this court in Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 1 Cir., 1932, 57 F.2d 96, 102. It may be that the case is good law but it was unique on its facts in 1932 and so far as we can determine it stands alone today. At this stage of the instant case there is no need for us to commit ourselves definitely on the Pick-Barth rule.