GEORGE R. WHITTEN, JR., INC.,
d/b/a Whitten Corporation,
Plaintiff-Appellant,

v.

PADDOCK POOL BUILDERS, INC., et
al., Defendants-Appellees.

No. 74–1169.

United States Court of Appeals,
First Circuit.

Argued Sept. 6, 1974.

Decided Dec. 17, 1974.

John E. Lecomte, Boston, Mass., with whom Frank T. Barber, III, Peter A. Donovan, Newton, Mass., and Lecomte, Shea & Dangora, Boston, Mass., were on brief, for plaintiff-appellant.

John D. Hawke, Jr., Washington, D. C., with whom Jack Lipson, Kenneth A. Letzler, and Arnold & Porter, Washington, D. C., for defendants-appellees.

Before COFFIN, Chief Judge, McEN-TEE, Circuit Judge, and CLARY *, Senior District Judge.

COFFIN, Chief Judge.

This appeal presents issues arising out of a private antitrust suit brought by George R. Whitten, Jr., Inc. (Whitten) against several associated companies (Paddock).[1] Both Whitten and Paddock manufacture and merchandize prefabricated metal recirculation systems for swimming pools constructed by public agencies. The complaint arises out of Paddock's efforts to persuade architects and engineers to use its proprietary specifications before competitive bidding procedures are undertaken. Whitten's complaint charges that these efforts exceed permissible bounds in that they include false representations, threats of litigation, and tying of accessory products, and that these in combination with an objective of excluding competitors constitute violations of sections 1 and 2 of

---

\* Senior District Judge of Eastern District of Pennsylvania sitting by designation.

1. Paddock of California, Inc. holds a patent on a swimming pool recirculating system and licenses Paddock Pool Equipment Co., Inc. to manufacture the water circulation and filtration systems and other accessories. It also franchises dealers with the right to use its trade names, trademarks, and patents. Pad-dock Pool Builders, Inc. constructs and installs swimming pools using products of Paddock Pool Equipment Co. All three companies are owned by Baker who is a corporate officer and chairman of the board in each. Baker owns 100% of Paddock Builders, and 70% of Paddock Equipment, but is not actively involved in the management of either company.

the Sherman Act, 15 U.S.C. §§ 1, 2, and § 3 of the Clayton Act, 15 U.S.C. § 14.

In a prior appeal, the issue was whether the district court properly granted summary judgment for Paddock on the ground that all efforts to induce governmental bodies to take action, notwithstanding the motives of the inducers, were immunized from antitrust liability. We held that the court erred in granting summary judgment. George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25 (1970) (Paddock I). Subsequently, the case was tried to the district court, sitting without a jury, and resulted in judgment for defendants. 376 F.Supp. 125 (D.Mass.1974).

We leave further delineation of facts to our discussion of particular issues. We shall examine the section 2 monopolization claim first, then the section 1 conspiracy claim, and the Clayton Act tying claim along with other miscellaneous issues where appropriate.

## I. Attempt to Monopolize Under Sherman Act § 2

■ Whitten begins its section 2 argument by stating that "the single most important issue in this case bearing upon plaintiff's allegations that defendants' conduct constitutes an attempt to monopolize in violation of Section 2 of the Sherman Act involves the determination of the relevant product market." Paddock agrees. While such a consensus among the parties is not binding upon us, we also think that a section 2 attempt case, like a monopolization case, requires a definition of the relevant market. We are aware that some authority can be cited to the contrary, principally Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir.), reh'g denied, 327 F.2d 478, cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), but note that most current cases do focus on market definition in attempt cases,[2] and that the status of Tidewater, even in the Ninth Circuit, is subject to some uncertainty.[3] The rationale supporting the majority rule appears to us persuasive. To be successful, an attempt case must establish both an intent to monopolize and a dangerous probability of successful monopolization, see, e. g., Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905) and American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); these elements take on meaning only with reference to an actual or potential exercise of power, which in turn must be assessed in the context of a relevant market. The contrary policy argument—that market definition should be eliminated in order to permit the application of sanctions to anti-competitive behavior by a single firm which does not approach monopolization—seems unpersuasive. See generally Cooper, supra, at 408, 414, 435–454.

This brings us to the critical issue of market definition. Swimming pool recirculation systems operate to remove water from the pool for purification, either through a drain in the pool's bottom, or through a gutter which rims the pool at its top. Water enters the gutter either through openings in its side called skimming weirs or by overflowing the gutter lip, and then passes through a filter and chlorinator. In conventional recirculation systems, the water passes outside of the pool proper and the filtered chlorinated water is returned to

2. See, e. g., Acme Precision Products, Inc. v. American Alloys Corp., 484 F.2d 1237, 1340 (8th Cir. 1973); Agrashell, Inc. v. Hammonds Products Co., 479 F.2d 269 (8th Cir. 1973); Advance Business Systems & Supply Co. v. SCM Corp., 415 F.2d 55, 69 (4th Cir. 1969); Bernard Food Industries, Inc. v. Dietene Co., 415 F.2d 1279, 1284 (7th Cir. 1969); Periodical Distributors, Inc. v. American News Co., 290 F.Supp. 896, 909 (S.D.N.Y.1968), aff'd per curiam, 416 F.2d 1330 (2d Cir. 1969); H. F. & S. Co. v. American Standard, Inc., 336 F.Supp. 110, 124 (D.Kan.1972); Diamond International Corp. v. Walterhoefer, 289 F.Supp. 550, 576–577 (D.Md.1968); United States v. Johns-Manville Corp., 259 F.Supp. 440, 451–452 (E.D.Pa.1966).

3. Cooper, Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two, 72 Mich.L.Rev. 375, 420–425 & nn. 168, 174, 176, 190 (1974) (hereinafter Cooper).

the pool through pipes built into the pool wall. The Whitten and Paddock systems, however, return the purified water through conduits built into the gutter itself, and thus eliminate the need for buried perimeter piping. Whitten argues strenuously that the relevant market is limited to public swimming pool pipeless recirculation systems, in which both Whitten and Paddock are substantial factors, not the entire market for recirculation systems in the public swimming pool industry, in which even Paddock is a minor figure.[4]

Whitten's argument centers on what it alleges are the realities of competition in the public swimming pool industry, specifically, the incentives to sell an architect or engineer on specifications indicating a particular recirculation system. The argument flows from the assumption that Whitten and Paddock are specialists in public pool recirculation systems, suppliers of patented prefabricated products. As such, they actively seek information, through contacts in the industry or Dodge Reports, a McGraw-Hill service, concerning projects in the design and planning stage. Their major sales effort is the active attempt to convince architects to specify their products. On the other hand, contractors who install conventional perimeter pipe recirculation systems, because they are not specialized suppliers of recirculation systems, have no incentive to expend resources encouraging the specification of a conventional system. This results from the fact that conventional perimeter pipes are not manufactured "products" in the same sense as are prefabricated pipeless systems, and any other contractor could bid

and comply with the conventional specifications in a given contract. Thus, argues Whitten, "no conventional gutter manufacturers or suppliers conceivably can be hovering around architects . . seeking to get their 'products' specified," and "there can be no competition without competitors."

■ We agree that conventional systems are not manufactured "products" in the same sense as pipeless systems.[5] It may also be true that most suppliers of perimeter pipe systems do not lobby architects and engineers to specify such conventional systems. Before we address this argument directly, we note that Whitten is on weak ground in so concentrating on competition among sellers. A market definition which is confined to the seller's perspective is not meaningful. United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 592 (S.D.N.Y.1958); cf. United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 392–393, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (Cellophane case). By necessity, definition of "market" must also focus on attitudes and reactions of consumers.

■ Indeed, appellants explicitly recognize that "the choice *for buyers* is between pipeless recirculation systems and conventional recirculation systems which are constructed on site and which employ buried perimeter piping." (Emphasis added.) The evidence in this case overwhelmingly justifies that conclusion. Architects and engineers attested to an industry-wide buyers' perception of competition between pipeless and conventional systems.[6] This perception finds

---

4. Both parties agree that pipeless recirculation systems of the type supplied by Whitten and Paddock are too expensive to compete successfully for use in most private swimming pools, and thus their market for the purposes of section 2 must be limited to public pools.

5. Conventional systems may be constructed from or adorned with galvanized steel, precast stone, aluminum, gunnite, epoxy paint, ceramic tile, or concrete, poured, pneumatically applied, or constructed with masonry.

Yet each of these systems is "conventional" to the extent that each is constructed on site and utilizes buried perimeter piping. It is the use of such piping which defines a conventional system, and not the materials from which the system is fashioned nor the particular design.

6. Architects hired to plan pools regularly investigate and evaluate the range of alternative designs and components for their constituent parts. They consult with and solicit budget estimates from manufacturers and suppliers

substance in the facts, conceded by Whitten, that conventional and pipeless systems are priced comparably, and that there are no constant or predictable price distinctions between the two systems. Significant differences in quality between pipeless and conventional systems are also missing as we explain below. As for differences in use by consumers, Whitten again concedes that the two types of systems are functionally interchangeable, that either can be used in any public pool in the country. The final choice of a pipeless or conventional system is determined by the peculiar needs and desires of owners, architects and engineers, and not by any fixed structural requirements. The market for a product must be defined not by focusing on a single factor alone but by evaluating the reasonable limits of that product's effective competition with other products. See Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 326, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); Standard Oil Co. v. United States, 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 93 L.Ed.2d 1371 (1949).[7] Such limits are drawn according to the cross-elasticity of demand for the product in question—the extent to which purchasers will accept substitute products in instances of price fluctuation and other changes.

"In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal.

of recirculation systems. They seek the expert advice of pool consultants and engineers. They conduct field investigations of both pipeless and conventional gutter systems. They review their own experience with both types of systems.

7. These cases were decided under provisions of the Clayton Act, 15 U.S.C. §§ 12–27 (1973), but nonetheless offer guidance to market definition under Sherman Act claims. See United

* * * * * *

"The market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." Cellophane case, supra 351 U.S. at 394, 404, 76 S.Ct. at 1007, 1012.

In light of the functional and price interchangeability of pipeless and conventional systems, it appears that the elasticity of demand for pipeless systems is high indeed.

Moreover, even tunnel vision focused exclusively on the efforts of the suppliers of pipeless systems reveals competition to substitute their product for conventional gutter systems. The testimony of Whitten's president confirms the clear implication of Whitten's advertising and intraoffice memoranda, that sales efforts with architects and owners seek to demonstrate Uniflow's superiority to other gutter systems. We take note also of the fact that there are specialized pool contractors which have an interest in and do seek the specification by name of their swimming pool designs, and therefore of the conventional systems they incorporate.[8] In addition, several swimming pool filter manufacturers and distributors offer architects a complete filtration equipment package designed to operate with conventional recirculation systems, and, according to a former Whitten manufacturing representative, counsel "with the architects and engineers on the design of the concrete or pneumatically applied concrete gutters." Thus, even when we adopt the supplier's perspective advanced by appellant, we find insufficient evidence to displace the district court's finding that there is "vigorous competition among suppliers and manufacturers . . . to get speci-

States v. Grinnell Corp., 384 U.S. 563, 572–573, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

8. Indeed, the evidence shows that the Whitten Uniflow system is not, strictly speaking a "manufactured product", but is constructed on site, like conventional systems, from materials acquired by Whitten: steel, the gutter's plastic return flow conduit, the plastic gate, the inlets and locking devices as well as other parts.

fied," and that it is "[b]efore the specifications are issued [that] competition is keenest." 376 F.Supp. at 130.[9] Therefore, whether we look to consumers or suppliers, we find vigorous competition and interchangeability between conventional and pipeless systems.

■ Appellant argues that if competition between pipeless and conventional recirculation systems suggests, as it does, a market definition encompassing both types of systems, the peculiar characteristics of commerce in pipeless systems render it a recognizable submarket within the meaning of Brown Shoe, supra:

"[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. . . . The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's, peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized venders." Brown Shoe, supra, 370 U.S. at 325, 82 S.Ct. at 1524. See United States v. Grinnell Corp., 384 U.S. 563 at 572, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); Cellophane case, supra, 351 U.S. at 393–395, 76 S.Ct. 994.

Of course, mere physical differences between one product and others will not alone isolate that product in a separate submarket. There is "no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities." Grinnell, supra, 384 U.S. at 572,

86 S.Ct. at 1704. But a real and outstanding product superiority will define a separate submarket for antitrust purposes.

An example of such superiority was found in Grinnell, supra, where the Supreme Court held that insurance company accredited central station fire and burglar protection services which receive automatic alarm signals and take protective action constitute a separate submarket far superior to nonaccredited systems utilizing watchmen, audible alarms, or similar devices. 384 U.S. at 573–575, 86 S.Ct. 1698. And professional world championship boxing contests attract such extraordinary attention and revenues as to achieve a quality sufficiently different from other boxing matches to constitute a separate market. International Boxing Club of New York v. United States, 358 U.S. 242, 249–251, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959). Cf. duPont, supra, 353 U.S. at 594, 77 S.Ct. 872; Bethlehem, supra, 168 F.Supp. at 589. Admittedly, these are distinctions in degree, not in kind. No objective criterion tells us that Rolls Royce competes with Mercedes but not with Volkswagen. Cf. United States v. Grinnell Corp., 236 F.Supp. 244, 253 (D.R.I.1964), decree modified, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); Cooper, 72 Mich.L. Rev. 375, 381 n. 25 (1974). But that recognition shows only the difficulty of our task, not its impropriety.

■ Appellant points out that pipeless systems, by eliminating buried perimeter piping, save excavation and maintenance costs, permit greater design flexibility, and outlast conventional systems two to three times. Yet despite these features, over ninety-seven per cent[10] of the pub-

---

9. The argument for a market definition encompassing both pipeless and conventional systems would have been more difficult to accept had we concluded that there is no effective competition between the two systems before product specification, since the evidence suggests that competition between the two systems attenuates after specification, despite the theoretical ability of conventional systems to qualify under the "or equal" clause.

10. Of 27,150 public pools built in the United States between 1966–1971 only a little over 800 (or 3%) utilized pipeless recirculation systems. This figure, taken from Hoffman Reports and relied upon by the parties and court below, is challenged here by appellant on the ground that the figure should be somewhat reduced to reflect the fact that certain American Public Health Association standards (requiring Whitten-Paddock type overflow recirculation systems) apply only to pools larger

lic swimming pools built in the United States between 1966 and 1971 utilized conventional systems. This court has already recognized that the market for pipeless systems is relatively new and expanding, 424 F.2d at 27, and we accept the conclusion of the district court that pipeless systems have made "significant inroads" into the recirculation system market. 376 F.Supp. at 127. But in light of the testimony of some architects that they clearly prefer conventional to pipeless systems, and of others that they are indifferent as between the two, we are unable to predict that the emergence of pipeless systems heralds the obsolescence of conventional systems, or even poses a substantial threat. Thus the peculiar qualities of pipeless systems do not describe a separate submarket.[11]

Moreover, we note that the product superiority standard is not a discrete criterion of market definition. Rather, it is one indication that a product may enjoy a specialized clientele and thus inelastic demand.[12] Yet in the case at hand, ninety-seven per cent of the "consumers" of recirculation systems prefer conventional systems to their functionally equivalent pipeless counterpart. Nor do pipeless systems enjoy any special industry recog-

nition, as did accredited protective systems in *Grinnell.* Neither the National Swimming Pool Institute, nor the American Public Health Association, nor the Massachusetts Sanitary Code standards draw any distinction between conventional and pipeless systems.[13] In short, there is no evidence that pipeless systems cater to a discrete class of consumers.

[6, 7] We therefore cannot say that the district court erred in holding that Whitten and Paddock compete for a share of the public swimming pool market. We believe this conclusion dispositive of Whitten's claim under section 2 of the Sherman Act. To sustain its charge that Paddock has attempted to monopolize the market for recirculation systems, Whitten must succeed in linking Paddock with both an intent to monopolize and a pattern of activity creating a dangerous probability of monopolization. *See Cellophane case,* 351 U.S. at 393, 76 S.Ct. 994; American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905). An intent to monopolize may be shown by direct evidence. *Cf.* United States v. Corn

than 1600 square feet. Some public pools may have been smaller. But Whitten's president deemed "extremely conservative" a similar report of 25,000 for 1964–1968; and if large semi-public pools of hotels, clubs, and apartment houses, on which pipeless systems may be used, be included, Paddock estimates that the relevant figure would increase from 27,150 to over 113,000, reducing its share of the market from 2.7% to 0.6%. We conclude that use of the 27,150 figure was not unfair to Whitten.

11. The Supreme Court recognized in the *Cellophane case* that no competitor of cellophane combined its qualities of transparency, strength, and low cost, yet included such competitors in its market definition in light of their functional interchangeability. 351 U.S. at 398–399, 76 S.Ct. 994. *See* Acme Precision Products, Inc. v. American Alloys Corp., 484 F.2d 1237, 1243 (8th Cir. 1973); *cf.* Bendix Corp. v. Balax, Inc., 471 F.2d 149, 161–162 (7th Cir. 1972), cert. denied, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973). Conventional recirculation systems are interchangeable with pipeless systems for 100% of their uses.

12. Examples are central station protective services specially accredited by insurance companies in *Grinnell*; men's, women's, and children's shoes attracting separate groups of customers in *Brown Shoe, supra,* 370 U.S. at 593–595, 82 S.Ct. 1502; and gospel music devotees in Affiliated Music Enterprises, Inc. v. SESAC, Inc., 268 F.2d 13, 15 (2d Cir.), cert. denied, 361 U.S. 831, 80 S.Ct. 82, 4 L.Ed.2d 74 (1959).

13. Whitten invokes a Scan (a McGraw-Hill microfilm service) survey, which found that only 54 of 339 pool projects specifying pipeless systems also specified conventional systems as an alternative, to support the assertion that many architects will accept no alternative to a pipeless system. But this evidence shows only that *after deciding* to specify a pipeless system, most architects will accept no alternative. It does not contradict the evidence of record that most architects will specify a pipeless system on some projects, conventional systems on others.

Products Ref. Co., 234 F. 964, 978 (S.D. N.Y.1916), appeal dismissed, 249 U.S. 621, 39 S.Ct. 291, 63 L.Ed. 805 (1919). The direct evidence of intent mustered by Whitten at most shows that Paddock intended to eliminate Whitten from the market, which would raise Paddock's share from 2.7 per cent to 3 per cent. Intent may also be inferred from conduct. *See, e. g.,* Union Leader Corp. v. Newspapers of New England, Inc., 180 F.Supp. 125, 140 (D.Mass.1959), aff'd in part, 284 F.2d 582 (1st Cir. 1960), cert. denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961). Yet the actions of Paddock assigned by Whitten as violative of section 2 are directed at Whitten, and only indirectly at suppliers of conventional recirculation systems, and thus suggest an intent no greater than that proved explicitly. *Cf.* American Football League v. National Football League, 205 F.Supp. 60, 65 (D.Md.1962), aff'd, 323 F.2d 124 (4th Cir. 1963). For similar reasons, Paddock's alleged conduct cannot be said to create a dangerous probability of successful monopolization. *See* Syracuse Broadcasting Co. v. Newhouse, 236 F.2d 522, 526 (2d Cir. 1956); Keco Industries, Inc. v. Borg-Warner Corp., 334 F.Supp. 1240, 1245 (M.D.Pa.1971); United States v. Charles Pfizer & Co., Inc., 245 F.Supp. 737, 739 (E.D.N.Y.1965).[14] We therefore affirm the district court's conclusion that Whitten has not proven a section 2 attempt-to-monopolize violation.

## II. Conspiracy in Restraint of Trade Under Sherman Act § 1

Even though the Paddock activities do not rise to the point of constituting a dangerous probability of monopoly in the relevant market, they must also be assessed against the standard of 15 U.S.C. § 1. Did they amount to a combination or conspiracy in restraint trade?

The conduct alleged was of four general types. The first was concerted activity by the Paddock companies and their franchised dealers to "get specified", i. e., to influence buyers of public swimming pools to draw up gutter specifications for bidding purposes that only Paddock could meet. The second was a series of misrepresentations, some unfairly presenting a favorable picture of the Paddock organization and gutter system, and others unfairly presenting an unfavorable picture of the Whitten organization and gutter system. A third variety of conduct was the making of threats of patent litigation to various potential customers of Whitten. Finally, there were several efforts made by Paddock using gifts and pressure, to influence prospective buyers and a provider

---

**14.** Whitten also claims that Paddock violated the Anti-trust Acts by tying sales of accessory products to sales of its recirculating system. The alleged infraction is said to take place through the specifications particularizing a description of the accessories that can be met only by Paddock. *See Paddock I,* 424 F.2d at 28. But Whitten could not prove tying without establishing power to influence the market in the tying product, Fortner Enterprises v. United States Steel, 394 U.S. 495, 505–506, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Northern Pacific R. Co. v. United States, 356 U.S. 1, 6–7, 78 S.Ct. 514, 2 L.Ed.2d 545 (1956). The district court having found no price, function or significant quality advantage, the necessary conclusion is that Paddock had no competitive advantage in swimming pool recirculation systems. *See* Capital Temporaries, Inc. v. The Olsten Corp., 506 F.2d 658, 661–662 (2d Cir. Oct. 17, 1974). Were this fact not dispositive, the claim here would nonetheless have been defeated by the district court's factual finding that no tying agreement existed. Given that the major competition takes place before the specifications are adopted, the existence in Paddock's specifications of requirements for its own accessory products is not probative. The key facts are, as the district court found, that Paddock does not refuse sale of its recirculating system if others' accessory parts are specified nor does it condition sale upon specification of its accessory parts. 367 F.Supp. at 134. The district court's factual findings were supported by the evidence and require affirmance of the holding that there was no tying because there was no "agreement [to] sell one product . . . only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier", *Northern Pacific R. Co., supra* at 5–6, 78 S.Ct. at 518.

**556**

of services to Whitten's disadvantage. These included an attempt to obtain a swimming pool report favorable to Paddock and unfavorable to Whitten by the State University Construction Fund of New York (SUCF); an effort to gain the patronage of the Massachusetts Public Works Department and to exclude Whitten from any of its contracts; interference with Whitten's attempts to obtain contracts at Fort Dix and Fort Devens; and an endeavor to persuade Scan Microfilm Service, a distributor of construction contracts information, to cease providing Whitten with data tailored to Whitten's needs.

 The district court made a number of specific findings.[15] As to efforts to induce architects and buyers to use Paddock specifications, it found that such a practice was customary in the industry; that "negative" specifications are common; that both Whitten and Paddock engaged in the practice; that the adoption of specifications was up to the judgment of architects, who also had the power to waive specific technical requirements and accept equivalent substitutes; that the promoting of proprietary specifications was essentially a "matter of salesmanship". As to the alleged misrepresentations of Paddock's experience and product, the court found them either without substance or not material, being in the category of "seller's talk", as was Paddock's downplaying of the performance of Whitten's gutter system. The court found the major instance of threats of patent litigation to have involved a valid issue, raised by Paddock in good faith; other evidence of threats, the court found, was less than clear and reflected only vigorous competition.

The specific findings of the court relating to the various alleged efforts of Paddock to interfere with Whitten's receipt of contracts and services were more ambivalent. While the SUCF report contained no specific misrepresentations, the court found that two persons associated with the preparation of the report were "encouraged" by a Paddock official, that they did influence the report, that the report treated Whitten unfairly, and that Paddock distributed 800 copies before SUCF revoked Paddock's permission to distribute. Again, although the court found that specifications favoring Paddock and hostile to Whitten excluded Whitten from bidding in the first two or three series of pools planned by the Massachusetts Department of Public Works, it also found that the specifications were the product of the judgment, not unduly influenced by Paddock, of the pool consultant—who had helped develop Paddock's design prior to its obtaining a license from the inventor. Nevertheless, the court also found that Paddock's official, Ellis, had attempted to give a set of golf clubs to an employee of the Massachusetts Department of Public Works connected with the program.

The court considered evidence of an alleged attempt by Paddock to "tamper" with the type of job specifications service provided by the Scan Microfilm Service for Whitten, limited to "metal gutters only". It found the evidence inconclusive "as to what precipitated [the] exchange between Paddock and Scan" and observed that no action was taken to affect the services rendered to Whitten. As to the Forts Dix and Devens jobs, the court found that although Paddock had seen Whitten's plans prior to the bid opening for the Devens job, it had a right to protest the award to Whitten. The delay in processing this protest—which proved to be unsuccessful—led to Whitten's insurer refusing to issue a bond for the Dix project; but the court

15. Whitten claims that the district court erred in excluding certain documentary exhibits, letters addressed to and received by Paddock, as failing to meet the business records exception to the exclusion of hearsay. Whitten is incorrect in pointing us to Massachusetts' law. 28 U.S.C. § 1732 controlled the district court in this matter. Not only was there no showing that the communications were authored or "made" in the normal course of business as required by § 1732, but there is here no showing of prejudice which would entitle Whitten to relief were the district court in error.

held that there had been no showing that Paddock knew of Whitten's bonding problem or filed its protest to bring about the insurer's action.

The court concluded its section 1 findings by noting its distaste for Paddock's efforts to influence the SUCF report, Ellis' aborted effort to give golf clubs to the Massachusetts Department of Public Works employee, and Paddock's sneak preview of Whitten's bid plans for the Devens project. It added, however, that while such acts "do not amount to conduct violative of 15 U.S.C. § 1.[,] [t]his is not to say that there may not be a remedy available to the plaintiff. I find only that the plaintiff has not met its burden under the antitrust statutes." 376 F.Supp. at 136.

We begin our analysis with an issue which was not specifically addressed by the district court: whether or not there was a combination or conspiracy within the meaning of the Sherman Act, among the three Paddock companies and their franchised dealers. The district court seems to have assumed the point as proven, for it devoted its analysis to the question whether the actions engaged in did or did not amount to a restraint of trade. Indeed, appellees have not briefed the issue, but have argued that even if sufficient proof of conspiracy is assumed, Paddock's conduct did not violate section 1.

While the doctrine recognizing what we might call "thin" conspiracies among corporations associated in one business enterprise has not been free of criticism,[16] it seems alive and well. The doctrine, emerging from United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), has been reaffirmed over the following two decades. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

 We are satisfied that under the *Yellow Cab* doctrine, the evidence is sufficient to portray a plurality of actors concerting their efforts toward a common end. In addition to the facts set forth at the outset of this opinion, *see* n. 1, bearing on the intercorporate relationships, we note the omnipresence in the evidence of Mr. Ellis. Mr. Ellis is president of Paddock Builders (Builders) and on the Board at Paddock Equipment. On behalf of Builders, Ellis seeks to get the Paddock system specified and installed, using among other things, brochures which he helped to prepare, printed by Paddock Equipment and at least one brochure printed by Paddock of California. Builders also holds sales meetings to train its own salesmen and sometimes those of other dealers; one of the instructors is vice president of Paddock Equipment. Ellis and his salesmen sometimes show a film prepared by Paddock Equipment. It is clear that the three Paddock companies are not competitors, but rather vertically affiliated for the purpose of marketing the Paddock system.

 In determining whether the combination on the part of the Paddock companies and their dealers was one in restraint of trade, we confront the findings of the district court. Whitten acknowledges that our standard of review is limited to discovering "clearly erroneous" findings of fact and legal error in the district court's conclusions. At the same time it charges the district court with having "dismembered" and "fragmentized" Whitten's proof and asks us to focus on Paddock's overall scheme, stating that we are "in the same position as the district court to discern the truth from the unmistakably clear facts." While we shall have more to say about Paddock's overall scheme in the sense of motive, we are conscious of not being in the same position as the district court. Our review of the facts is, as we have

16. *See, e. g.,* Handler, Twenty-Five Years of Anti-Trust, 73 Col.L.Rev. 415, 452–53 (1973).

often said, limited by the "clearly erroneous" standard under Rule 52(a). United States v. United States Gypsum Co., 333 U.S. 364, 393–399, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Custom Paper Products Co. v. Atlantic Paper Box Co., 469 F.2d 178, 179 (1st Cir. 1972).[17]

▇ With this as our standard, we have little difficulty in dealing with the court's findings as to most of the conduct charged to Paddock. The attempt to gain adoption by architects of a supplier's proprietary specifications was found to be a common practice, a "matter of salesmanship". Indeed, Whitten does not dispute this, but argues at length that there is a significant difference between A's promoting a specification that calls for features which A's product has and his promoting one that adds "and no product which does the job differently." [18] We concede that there may be a difference in the degrees of advantage gained by the latter "negative" specification (which the district court found common in the industry), but, absent coercion, we are not able to

say that the district court was clearly wrong in denominating this conduct a matter of salesmanship.[19] Moreover, the bulk of Paddock's so-called restrictive or negative specifications were arguably linked to a functional consideration.

▇ The court's findings as to alleged misrepresentations, both as to Paddock's superiority and as to Whitten's inferiority are not clearly erroneous. These were, in the main, representations which are capable of two interpretations, one of them in accord with the truth. Whitten's arguments as to some of these diminish to the trivial. As for the threats of patent litigation, the evidence is far from sufficient to demonstrate clear error in the district court's findings.

This leaves us with the findings, which we have termed ambivalent, concerning Paddock's efforts to interfere with Whitten's business prospects or services. Clearly the court found that distasteful efforts had been made to slant the SUCF report, to influence by improper means the Massachusetts Department of

**17.** Similarly, failing to recognize the boundaries of procedural liberality, appellant asks us to substitute our own findings as to territorial restrictions based on a contractual agreement between Paddock and its franchise dealers. We decline the invitation. No allegation of territorial restrictions was made in the complaint, no findings of fact were sought by the plaintiff, and no objection raised below to the court's failure to make the relevant inquiry. The district court was not apprised of the appellant's belief that such findings were warranted nor of its theory. Rule 46 F.R.Civ.P. forecloses relief under such circumstances. Wright and Miller, Fed.Practice and Pro. § 2472.

**18.** Whitten to illustrate a "bad" specification gives us an example of a potential Paddock-like addition, indicated in italics, to its system's description:

"Drainage channel of gutter shall be completely covered with removable grill which will not allow entrapment of bather's limbs, and will prevent large debris from entering gutter drain channel, and *systems which do not provide a covered and removable grill shall not be considered equal.*"

**19.** Whitten asserts that the mere showing of adoption of proprietary and exclusionary

specifications is sufficient to establish a violation of the antitrust laws. No case law supports this thesis. Certainly not *Paddock I,* 424 F.2d 25, which held only that if facts surrounding adoption of proprietary specifications indicated abuse of the competitive system a claim would be stated. Success would have to be premised, however, on showing either a conspiracy with those adopting the specifications, neither claimed nor shown here, Kendall Elevator Co., Inc. v. LBC & W Associates of S.C., Inc., 350 F.Supp. 75 (D.S. C.1972), or that coercion by the defendant or the absence of available prespecification competition inhibited selection. Security Fire Door Co. v. County of Los Angeles, 484 F.2d 1028, 1030–1031 (9th Cir. 1973); Federal Sign & Signal Corp. v. Bangor Punta Operations, Inc., 357 F.Supp. 1222, 1240 (S.D.N.Y.1973). But as we have indicated, Whitten on remand did not succeed in showing that free choice was not exercised by architects and engineers who adopted the Paddock specifications. The fact, argued again in appellant's reply brief, that architects and engineers may prefer to adopt existing specifications than to create their own only serves to illustrate that Paddock was well advised in putting in its effort at an early stage.

Public Works, to sneak preview the Fort Devens bid, and to cut off the tailored "metal gutters only" Scan Microfilm Service. But the court found that Whitten had, after all, gotten the contract (Fort Devens) and continued to receive the service (Scan); that Paddock was not the operative cause of decision (Fort Dix bond refusal; Massachusetts Public Works contracts); and made no finding as to any harm stemming from the SUCF report. No finding as to Paddock's motivation was made, although statements of the vocal Ellis were introduced into evidence that he told Whitten's president, "George, we will run you out of business if it takes all the money we have", and that he urged Paddock's salesmen to "control, hold, gouge, coerce . . . get specified, stay specified and obtain a contract."

The question posed, after reviewing and accepting the specific findings of the district court, is whether this aggregation of dirty tricks, played by those with little market power, which were not demonstrably successful, if aimed at eliminating other parties from competition (or, as some of the evidence indicates, principally Whitten), constituted a violation of 15 U.S.C. § 1. This raises, as appellant recognizes, the question whether such a combination of conduct and motive amounts to conduct which is illegal per se. If so, the proper course for us is to remand for further findings as to motivation. If not, our course is to apply the "Rule of Reason" to the findings of the district court.

■ At this point, we are struck by the difficulty of analysis. Section 1 is a broad charter, stemming from a common law heritage, but taking shape from eight decades of interpretation by the Supreme Court and other tribunals. Most generalized anti-competitive conduct is subjected to a "rule of reason" analysis, involving, among other factors, a study of the consequences of the conduct on the affected market. Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); United States v. Topco Associated, Inc., 405 U.S. 596, 610, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). But the landmark cases often concern giants in an industry which have been charged with now classic forms of distorting market conditions—price fixing,[20] group boycotts,[21] market allocation,[22] restrictive practices involving patents,[23] and certain competition-preclusive conduct by monopoly groups.[24] Such practices are now recognized as being illegal per se; no assessment of their actual effect is required because it is assumed that the practice is inherently subversive of competition. On the other hand, analysis of market power as opposed to effect is required for most per se violations[25] although not for price fixing; in this latter unique realm anti-competitive purpose, without more, has been said to be sufficient to invoke the sanctions associated with section 1 violations.[26]

The argument presented here is that the same standard of judgment applicable in the price fixing situation should apply in the instant case where several allied corporations, accounting for a small portion of sales in the public swimming pool market are alleged to have engaged in a variety of unfair business practices, arguably aimed at taking business away from all others. But the major allegations do not charge and Whitten has not established actions amounting to attempted price-fixing or any oth-

20. E. g., United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

21. Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

22. United States v. Topco Associated, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

23. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

24. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

25. See, e. g., Cooper at 423 n. 182, and discussion of tying, supra, at n. 14.

26. United States v. Socony-Vacuum Oil Co., Inc., supra, 310 U.S. at 225–226 n. 59, 60 S.Ct. 811.

er conduct heretofore held illegal per se. Is the Sherman Act applicable to the kind of conduct alleged here? If applicable, is the presence of a purpose to eliminate competition (or a competitor) without evidence of significant potential or actual effect on the relevant market sufficient to constitute a violation of section 1? If the "rule of reason" applies, how serious or broad must be the effects before antitrust sanctions apply?

■ We are not willing to say that the Sherman Act is not applicable to the range of unfair competitive methods evidenced here. As the legislative history of the Sherman Act reveals, the draftsmen recognized that there was no finite catalogue of unfair practices which could be the devices of a conspiracy to restrain trade. Cooper at 430. At the same time we see no license to proclaim unethical efforts to influence buyers, advisors to buyers, or suppliers of competitors to be illegal per se under the antitrust laws. Such actions have long existed, but have not as yet joined the per se pantheon recognized by the Supreme Court.[27] This is understandable, since the policy reasons dictating a per se approach are noticeably absent when we consider such conduct as is evidenced here.

The actions carried on by Paddock do not involve the complex systematic influences on production, price formation, and market allocation which a court feels ill equipped to assess. The nexus between the practice and a tendency to monopoly is not so close and likely that the certainty of a clear and absolute standard is preferred to a case-by-case analysis. And, to the extent that the lessening of the volume of litigation is a factor in adopting a per se classification, the extension of such to what Judge Frankel has termed a "garden variety" competi-

tive business tort. Vogue Instrument Corp. v. Lem Instruments Corp., 40 F.R.D. 497, 499 (S.D.N.Y.1966), would not only be a powerful stimulus to federal antitrust litigation, but would be so in a field of law traditionally dealt with by state courts.

We are also concerned over the implications of what has been termed "judicial crime making". Cooper at 457. Were we to declare the conduct and intent arguably evidenced in this case a per se violation of section 1, we would confront initially the problem of formulating a neutral definition. If we said that the range of practices engaged in here amounted to such a violation, this would be an ad hoc judgment, carrying little precedential value but spawning future efforts in similar but somewhat varied circumstances to pin the same label. Even if we were to identify one or several particular practices, we would be elevating to a federal crime what has previously been attacked on the basis of state law or civil penalty. In so doing, we would run the risk of overbreadth, encompassing conduct which fosters competition; of weakening, through making available sanctions which may in practice be avoided, the deterrent effect of the antitrust laws; of subjecting defendants to captious resort to treble damage suits, with evaluation of subjective intent being the chief determinant, and varying from jury to jury.[28] Moreover, extending a per se classification to the kinds of competitive torts confronted here would go far to yielding to a long resisted temptation to create a federal common law of unfair competition.[29]

Appellant seeks added support from four cases involving "unusual fact situations, generally not present in antitrust conspiracy cases."[30] All of them deal

---

27. Appellant, to support its case for per se treatment of Paddock's conduct, chiefly relies on leading Supreme Court cases in this pantheon. So to rely, without addressing the question why the list should be expanded, is to assume the point to be proven.

28. See Cooper at 457–462.

29. See cases at Cooper, p. 454, n. 317.

30. Perryton Wholesale, Inc. v. Pioneer Distributing Co., 353 F.2d 618 (10th Cir. 1965); Atlantic Heel Co. v. Allied Heel Co., 284 F.2d

with the efforts of former employees of the plaintiff to drive the latter out of business by such means as hiring key personnel, using confidential information, raiding plaintiff's customers, disparaging plaintiff and its product, etc. All of them held that such conduct was illegal per se under section 1.

The two oldest progenitors of this small family were our own decisions. In Albert Pick-Barth v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir.), cert. denied, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932), dealing with a case where the defendant was allied with other corporations, collectively a dominating factor in the trade in which plaintiff was engaged, we said that, "intent . . . to eliminate a competitor . . . and thereby suppress competition . . . is a violation of section 1 . . .." *Id.* at 102. In Atlantic Heel Co. v. Allied Heel Co., 284 F.2d 879 (1st Cir. 1960), dealing with allegations of similar but more extreme conduct by a leading concern in the trade, we reversed a judgment of dismissal for failure to state a claim, and held the allegation of intent sufficient to state a per se claim under the circumstances. While the writer of the opinion, Judge Hartigan, discounted the significance of the size and influence of the defendant in *Pick-Barth, id.* at 881. Judges Woodbury and Aldrich concurred but declined to do so on the basis of the *Pick-Barth* rule. *Id.* at 885.

Perryton Wholesale, Inc. v. Pioneer Distributing Co., 353 F.2d 618 (10th Cir. 1965), cert. denied, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966), relied largely on *Pick-Barth* and *Atlantic Heel.* The most recent case, C. Albert Sauter Co. v. Richard S. Sauter Co., 368 F.Supp. 501 (E.D.Pa.1973), appeal dismissed pursuant to Rule 42(b) of F.R.A.P., No. 73–2003 (3d Cir. Apr. 4, 1974), relied on all three.

Thus if the instant case is of the genre of this family of four, we are the chief authority for appellant's contention that Paddock's actions and motivation constitute a per se violation, without considering any impact on competition. We acknowledge, forty-two and fourteen years later, that we have some doubts about our pronouncements. It is, first of all, clear that we have only two lineal descendants in all these years and we cannot believe that sharp practice has been so rare. More substantively, we share the doubts of Judge Frankel in *Vogue Instruments, supra,* that this kind of conduct does not feel to lawyers like the stuff of antitrust. We have in mind also the criticism voiced not only of the conspiracy analysis in *Pick-Barth* and *Atlantic Heel,* not relevant here, but of our failure to define with any precision the practices held to be a per se violation. *See,* Boone, Single Corporation Competitive Torts and the Sherman Act, 2 Ga.L. Rev. 372, 387–389 (1968). More generally, we are impressed by reflecting on the carefully selected considerations which have gone into the declaring of a few practices as per se violations, the danger of casual extension of the category, the value of prior case experience, the availability of the law of torts to deal with such issues as interference with contractual relations and interference with prospective advantage, not to forget the availability of the Federal Trade Commission Act. We have been influenced in our consideration of this issue by a perceptive student case note, analyzing *Sauter* and its predecessors, in 42 Fordham L.Rev. 909 (1973–1974).

Insofar as *Pick-Barth* and *Atlantic Heel* may be said to stand for the broad proposition that unfair competitive practices accompanied by an intent to hurt a competitor constitute per se violations of the antitrust laws, we do not now accept their teaching. We do not feel it necessary to criticize their results on the fact

879, 885 (1st Cir. 1960); Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir. 1932), cert. denied, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932); C. Albert Sauter Co. v. Richard S. Sauter Co., 368 F.Supp. 501 (E.D.Pa.1973).

situations there presented—an effort by a defendant which was a significant factor in the market to eliminate a competitor. These were instances, as were *Perryton* and *Sauter*, of a sharply focused effort to drain off from a plaintiff its key personnel, confidential information, customer lists, and reputation. In the instant case the focus is not on crippling the organization of a competitor but on beating it in the market place. Perhaps the difference is only that between going to the jugular and going to one of the lesser arteries. But the difference, we feel, is enough. Paddock is leaving Whitten as an organization alone; it is concentrating on winning customers. Each customer is its target. Obviously it has subordinated business morality to its goal of more customers. But we cannot say that such attempts, even though unfair and reprehensible, amount to a per se violation of the antitrust laws.

 This conclusion leaves us with the question whether, Paddock's conduct not being a per se violation of section 1, the rule of reason has been satisfied by the district court's findings. We think it has. The dispositive element seems to us to be the effect of Paddock's actions on competition in the affected market.[31] While the relevant market for purposes of section 2 is not necessarily that for purposes of section 1, there still must be some consideration of the effect of a defendant's conduct on some significant part of the market. There is no evidence whatever of harm to general competition in the market. Here at best there was evidence that Whitten lost some contracts. Even Whitten has steadily gained in sales volume, although not so much as it thought it should have gained. The number of competitors has not been affected, nor has the market been fixed or manipulated, so that competition is lessened. Paddock's behavior, however offensive, has not exceeded the bounds of "reason".

Affirmed.

---

**31.** We note again the importance of potential for actual effect on the market even in per se cases except for price fixing. We believe the absence of that potential here would defeat Whitten's claim even if we were to approach this conduct as per se unlawful.